# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 15-3439

Eric C. Cantrell, Appellant,

v.

David J. Shulkin, M.D.,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veteran's Appeals

(Argued February 27, 2017                    Decided April 18, 2017)

*Barbara J. Cook*, of Cincinnati, Ohio, with whom *Elizabeth E. Olien* and *Christian A. McTarnaghan* were on the brief, both of Providence, Rhode Island, for the appellant.

*Omar Yousaf*, Appellate Attorney, with whom *Leigh A. Bradley,* General Counsel; *Mary Anne Flynn*, Chief Counsel; and *Kenneth A. Walsh*, Deputy Chief Counsel, all of Washington, D.C., were on the brief, for the appellee.

Before LANCE, SCHOELEN, and BARTLEY, *Judges.*

BARTLEY, *Judge*, filed the opinion of the Court. LANCE, *Judge*, filed a concurring opinion.

BARTLEY, *Judge*: Veteran Eric C. Cantrell appeals through counsel an August 13, 2015, Board of Veterans' Appeals (Board) decision denying (1) referral for consideration of an extraschedular evaluation for service-connected ulcerative colitis with resection, status post laparoscopic and open total proctocolectomy with j-pouch ileoanal anastomosis, pouchitis, and diverting ileostomy[1] (hereinafter, post-surgery ulcerative colitis); and (2) entitlement to a total

---

[1] A "proctocolectomy" is "surgical removal of the rectum and colon." Dorland's Illustrated Medical Dictionary 1521 (32d ed. 2012) [hereinafter Dorland's]. "Ileonal anastomosis" is a surgical procedure where a portion of the small intestine is sutured into a pouch and attached to the anus to allow continent passage of stools. *Id.* at 75, 1505, 1626; *see Total Proctocolectomy and Ileal-Anal Pouch*, Nat'l Insts. of Health, Medline Plus Medical Encyclopedia, https://medlineplus.gov/ency/article/007380.htm (last visited March 20, 2017). "Pouchitis" is inflammation of the ileoanal pouch. Dorland's at 1506.

disability evaluation based on individual unemployability (TDIU). Record (R.) at 2-18.[2] This matter was referred to a panel of the Court, with oral argument, to address VA's standard for determining whether employment qualifies as "in a protected environment" for TDIU purposes.[3] For the reasons that follow, the Court will set aside the portions of the August 13, 2015, Board decision denying referral for consideration of an extraschedular evaluation for service-connected post-surgery ulcerative colitis and entitlement to TDIU, and remand those matters for readjudication consistent with this decision.

## I. FACTS

Mr. Cantrell served on active duty in the U.S. Army from January 1988 to September 1988 and in the U.S. Air Force from May 2003 to August 2003. R. at 1319, 1347.

The current appeal stems from a September 2006 claim for service connection for ulcerative colitis, R. at 1778-92, which was granted by the Board in December 2011, R. at 1011-16. The next month, a VA regional office (RO) assigned staged evaluations for that condition, including a 40% evaluation for post-surgery ulcerative colitis effective April 1, 2007. R. at 2024-35. Mr. Cantrell filed a timely Notice of Disagreement as to that decision, requesting an increased initial evaluation for post-surgery ulcerative colitis. R. at 936. Since that time, he claimed and was granted secondary service connection for urge incontinence, degenerative joint disease (DJD) of the left and right hips, hemorrhoids, erectile dysfunction, and pouchitis, R. at 464-75, 791-804,

---

[2] The Board also granted an earlier effective date of September 27, 2011, for the grant of service connection for urge incontinence. R. at 4, 7-8. Inasmuch as this finding is favorable to the veteran, the Court will not disturb it. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."). In addition, the Board denied entitlement to a schedular evaluation in excess of 40% for post-surgery ulcerative colitis; denied an effective date earlier than September 27, 2011, for the grant of service connection for urge incontinence; and dismissed claims for increased evaluations for service-connected urge incontinence and hemorrhoids. R. at 5, 7-14. Because Mr. Cantrell has not challenged those portions of the Board decision, the appeal as to those issues will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-85 (2015) (en banc) (declining to review the merits of an issue not argued on appeal and dismissing that portion of the appeal); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (same).

[3] The Court held oral argument for this case on February 27, 2017. On February 23, 2017, less than seven days before oral argument, Mr. Cantrell filed a motion for leave to file a notice of supplemental authority out of time, along with the notice itself. *See* U.S. VET. APP. R. 30(b) ("In no case will supplemental authority—pertinent and significant or otherwise—be accepted by the Clerk for filing fewer than 7 days preceding a scheduled oral argument, without leave of the Court.") The Court will grant the motion for leave and will consider the authorities cited in the February 23, 2017, notice in making this decision.

936; *see* R. at 464-75; requested and was denied entitlement to TDIU, R. at 424-61, 721-27; and perfected timely appeals to the Board of, inter alia, the RO's denials of an increased initial evaluation for post-surgery ulcerative colitis and entitlement to TDIU, R. at 93-94, 154-56. As relevant here, the veteran's combined disability evaluation has met or exceeded 70% since September 27, 2011. R. at 15.

The record of proceedings contains extensive evidence regarding Mr. Cantrell's service-connected disabilities. In October 2008, a private physician sent VA a letter indicating that the veteran had loose stools and abdominal discomfort that made it difficult for him to stand or be away from a bathroom for prolonged periods of time, R. at 1245; a September 2009 treatment note from the same physician reflects the veteran's report of having up to 10 bowel movements per day, R. at 1248. At an April 2010 VA examination, Mr. Cantrell reported 6 to 10 bowel movements per day, with occasional episodes of pouchitis. R. at 1123. He reiterated those symptoms in an August 2010 statement in support of claim (SSC), and added that, during pouchitis episodes, he had 12 to 18 bowel movements per day, needed to wear absorbent pads, had to change his underwear 3 to 5 times per day, and could not eat lunch at work for fear of soiling himself. R. at 1109.

At an April 2011 VA examination, Mr. Cantrell again reported 6 to 10 bowel movements per day when feeling well and 16 to 20 bowel movements during monthly episodes of pouchitis, which lasted three to four days. R. at 1095. He told the examiner that he worked as a park ranger and spent most of his day in the car; he was only able to do that work because he had "bathrooms mapped out on his routes." R. at 1095-96. He indicated, however, that he needed to stay home from work when he had pouchitis. R. at 1096. The examiner opined that the veteran's monthly bouts of pouchitis "interfered with his work on many . . . occasions[,] making it difficult for him to perform his job." *Id*.

At a September 2011 Board hearing, Mr. Cantrell testified that he ordinarily had 6 to 10 bowel movements per day and 10 to 20 during an episode of pouchitis. R. at 1037-38. He stated that during pouchitis flare-ups he had watery diarrhea with urinary and fecal leakage, which required him to change his underwear two to three times per day. R. at 1038-39. He also testified that he had to resign from his previous job as a highway patrolman due to ulcerative colitis. R. at 1040-41. Regarding his current job as a park ranger, the veteran stated that he was able to work

3

around his condition by knowing the location of every restroom in the park and by avoiding eating anything at work during pouchitis episodes. R. at 1044-45. He stated that his condition prevented him from attending training lunches or doing physical training exercises for fear of soiling himself. R. at 1045. In an April 2012 SSC, he described recurring bouts of pouchitis that caused decreased sphincter control and increased bowel movements of 12 to 20 per day. R. at 967.

In July 2012, a VA examiner opined that Mr. Cantrell's service-connected ulcerative colitis impacted his ability to work because he needed to use the restroom frequently and had disabling abdominal pain during episodes of pouchitis. R. at 906-07. At another VA examination in November 2012, the veteran reported that he had to take time off from his job as a park ranger whenever he had pouchitis, R. at 753, and he complained of abdominal cramping with excessive, bloody diarrhea two to three times per month; abdominal pain two to three times per week; diarrhea 7 to 14 times per day; nausea five to six times per month; occasional vomiting; and pulling pain upon physical activity, R. at 755-56.

In his December 2012 application for TDIU, Mr. Cantrell indicated that he was working fulltime as a park ranger, a position that he held since 2007, and had made $32,950 the prior year. R. at 723. He explained that he was only able to maintain that job because of the many accommodations made by his employer, including being assigned only to duty stations near restrooms, not being required to remain at emergency scenes, and always having another ranger on call for him in case he needed to leave work early for medical reasons. R. at 727. Mr. Cantrell further stated that about three times per month he got so sick that he had to leave work early and that another two to three times per month he was unable to go to work at all. *Id.* According to the veteran, his employer was thinking of moving him to the night shift because he had recently been absent more often than he had been at work due to medical appointments and illness. *Id.* A March 2013 employer letter indicated that the veteran had been switched to the night shift due to repeated absences for medical appointments. R. at 679. The employer noted that he only assigned the veteran jobs near bathrooms and that it would have been too costly to employ the veteran without these accommodations. R. at 679-80.

An October 2014 VA medical examination report noted that the veteran's service-connected bilateral hip problems impacted his ability to work by causing, inter alia, difficulty walking and bending. R. at 482.

In March 2015, Mr. Cantrell submitted an employability assessment completed by a private vocational expert. R. at 79-91. The vocational expert noted that the veteran required 10 to 15 bathroom breaks per workday, lasting around 20 minutes each, and that his employer gave him "full liberty" to take rest breaks as needed to use the bathroom, stop and stretch his hips, or lie down to restore his composure and energy. R. at 81-83. The vocational expert opined that Mr. Cantrell's work as a park ranger was "tantamount to a 'protected employment' situation" because "no typical employer can or would allow/accommodate a worker to take three and one third (3 1/3) hours per workday/work shift for bathroom break purposes." R. at 84. He stated that it was reasonable for an employer to terminate an employee if "off task" work exceeds 45 to 60 minutes per workday and concluded that the veteran's "above-noted need for bathroom/rest breaks renders him totally unemployable for any competitive occupation and that his present employment situation far exceeds the bounds of typical or normally-expected employer accommodation of a disabled worker." *Id.* The vocational expert ultimately classified Mr. Cantrell's employment situation as an "unprecedented accommodation" that was "completely contingent upon the unprecedented beneficence" of his employer. R. at 85.

In August 2015, the Board issued the decision currently on appeal. R. at 2-18. As relevant here, the Board denied entitlement to TDIU because it found that Mr. Cantrell's current employment as a park ranger was substantially gainful, despite the numerous accommodations provided by his employer. R. at 15-17. The Board discounted the March 2015 vocational expert's opinion that the veteran's job qualified as "protected employment" because the symptoms the veteran reported to the vocational expert were inconsistent with the veteran's prior statements regarding his symptoms when he was not experiencing pouchitis. R. at 16-17. Relying on the other evidence of record, the Board reasoned that the veteran's employment was not "marginal employment akin to employment in a protected environment" because it entailed substantial responsibilities and "the accommodations made by [his] employer have allowed him to perform his job successfully and on a full[-]time basis." R. at 17. The Board also considered whether Mr. Cantrell was entitled to referral for consideration of an extraschedular evaluation based on the combined effects of his service-connected disabilities but concluded that he was not because "there are no additional service-connected symptoms that have not been attributed to a specific service-connected disability." R. at 15. This appeal followed.

In February 2017, Mr. Cantrell notified the Court that he had retired from his job as a park ranger in January 2017 due to service-connected ulcerative colitis, urge incontinence, and left and right hip disabilities. Appellant's February 7, 2017, Notice at 1 & Exhibit 1. However, on April 5, 2017, the veteran notified the Court that he had not retired in January 2017, but rather, he had provided his employer with a letter of resignation declaring his intent to retire. Appellant's April 5, 2017, Notice at 1 & Exhibit 1.

## II.  ANALYSIS

### A.  TDIU

TDIU will be awarded when a veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. 38 C.F.R. § 4.16 (2016); *see Hatlestad v. Brown*, 5 Vet.App. 524, 529 (1993) ("[T]he central inquiry in determining whether a veteran is entitled to a TDIU rating is whether the veteran's service-connected disabilities alone are of sufficient severity to produce unemployability."). When such unemployability is shown and the veteran meets certain numeric evaluation requirements, the Board may award TDIU in the first instance, 38 C.F.R. § 4.16(a); otherwise, the Board may only refer the case to the Compensation Service Director for consideration of extraschedular TDIU, 38 C.F.R. § 4.16(b).[4] *See generally Pederson*, 27 Vet.App. at 285-86.

Relevant to this appeal, § 4.16 states that "[m]arginal employment shall not be considered substantially gainful employment." 38 C.F.R. § 4.16(a); *see Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 70 (2016) (concluding that the terms "substantially gainful occupation" and "substantially gainful employment" in § 4.16 are "synonymous"). The regulation continues:

> For purposes of this section, marginal employment generally shall be deemed to exist when a veteran's earned annual income does not exceed the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person. Marginal employment may also be held to exist, on a facts found basis (includes but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual

---

[4] The parties do not dispute the Board's finding that Mr. Cantrell has met or exceeded § 4.16(a)'s numeric criteria for schedular TDIU since September 27, 2011, and that, prior to that date, he was only eligible for TDIU via extraschedular referral pursuant to § 4.16(b). R. at 15.

income exceeds the poverty threshold.  Consideration shall be given in all claims to the nature of the employment and the reason for termination.

38 C.F.R. § 4.16(a).[5]  In other words, "a veteran can establish marginal employment *either* by demonstrating an income less than the poverty threshold established by the U.S. Census Bureau *or* by the facts of his [or her] particular case." *Ortiz-Valles*, 28 Vet.App. at 71 (emphasis added). Regardless of the method, "if the evidence or facts reflect that a veteran is capable only of marginal employment, he [or she] is incapable of securing or following a substantially gainful occupation and is therefore entitled to [TDIU] if [his or her] service-connected disabilities are the cause of that incapability." *Id*.  The instant case involves the second method of establishing marginal employment—i.e., on a facts found basis where earned annual income exceeds the poverty threshold.

As with any finding on a material issue of fact and law presented on the record, the Board must support its TDIU determination with an adequate statement of reasons or bases that enables the claimant to understand the precise basis for that determination and facilitates review in this Court.  38 U.S.C. § 7104(d)(1); *Pederson*, 27 Vet.App. at 286; *Todd v. McDonald*, 27 Vet.App. 79, 88 (2014); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990).  To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence it finds persuasive or unpersuasive, and provide reasons for its rejection of material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

### 1. The Parties' Arguments

Mr. Cantrell principally argues that the Board provided inadequate reasons or bases for its determination that his employment as a park ranger did not qualify as "in a protected environment" for TDIU purposes.  Appellant's Brief (Br.) at 14-20; Reply Br. at 1-5.[6]  He asserts that, although

---

[5] Although the term "marginal employment" appears only in § 4.16(a), there is nothing in the regulation to suggest, nor has the Secretary asserted, that VA is precluded from determining that marginal employment exists for the purposes of referring a case for consideration of extraschedular TDIU under § 4.16(b).

[6] Although § 4.16(a) lists employment in a protected environment as an example of marginal employment and expressly states that marginal employment may be held to exist in other situations when earned annual income exceeds the poverty threshold, Mr. Cantrell does not argue that the Board erred in finding that his employment as a park ranger did not qualify as marginal employment on any other basis, *see* Appellant's Br. at 14-20; Reply Br. at 1-5, and he asserted at oral argument that it was not necessary for the Court to address marginal employment outside of

VA did not define employment "in a protected environment" in § 4.16(a), that term's meaning can be discerned from the plain language of the regulation—namely, "a work environment in which [] a veteran [is] allowed to maintain employment because the employer provide[s] accommodations that protect the veteran by allowing him or her to work despite not being able to meet the normal criteria required for an occupation." Appellant's Br. at 15. In his reply brief, Mr. Cantrell offers a slightly different definition—namely, that "employment in a protected environment" exists when a veteran "is only able to work because his employer protects him from termination." Reply Br. at 2. Relying on these definitions, Mr. Cantrell contends that the Board, in finding that his employment as a park ranger did not qualify as "in a protected environment" because he was given significant responsibilities and was able to perform his job successfully with accommodations, imposed too high a standard that is not supported by the regulation. Appellant's Br. at 14-20; Reply Br. at 1-5. In the alternative, he argues that the Board erred in finding his statements to the March 2015 vocational expert less credible than those made during medical treatment. Appellant's Br. at 20-24; Reply Br. at 5-8.

The Secretary disputes these contentions and urges the Court to affirm the Board decision because the Board adequately assessed entitlement to TDIU on a facts found basis as required by § 4.16, including properly discounting the March 2015 vocational expert's opinion. Secretary's Br. at 12-21. In his supplemental memorandum of law, the Secretary asserts that "VA has purposely chosen not to define 'employment in a protected environment,' leaving it to the discretion of the factfinder on [a] case-by-case basis." Secretary's Supplemental Memorandum of Law (Supp. Memo) at 12. The Secretary requests that the Court defer to this intentional ambiguity, which he contends is consistent with the language of § 4.16(a) and VA policy and reflects the agency's fair and considered judgment that VA adjudicators must possess the utmost leeway in making this "factual determination." *Id*. at 12-14.

Mr. Cantrell vociferously objects to the Secretary's position, characterizing it as "unfettered" and "unlinked to any authoritative standard," inviting arbitrary and capricious

---

the protected environment context, Oral Argument at 21:43-22:17. Therefore, the Court will focus solely on the Board's determination that Mr. Cantrell's employment did not qualify as "in a protected environment" and will not address any other possible form of marginal employment. *See Grivois v. Brown*, 6 Vet.App. 136, 138 (1994) (explaining that the Court has discretion to deem abandoned issues not argued on appeal).

decisionmaking by VA. Appellant's Supp. Memo at 3-9. He argues that, without an articulated standard for employment "in a protected environment," he cannot discern and the Court cannot determine whether the factors the Board considered in this case were appropriate. *Id*. at 8-9. The Court agrees with this latter contention.

### 2. *Employment in a Protected Environment*

This case involves the interpretation of the term employment "in a protected environment" in § 4.16(a). We therefore begin our analysis with an examination of the language of that regulatory provision. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute [or regulation] is its language."); *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."); *see generally Southall-Norman v. McDonald*, 28 Vet.App. 346, 351 (2016). If the plain meaning of the term employment "in a protected environment" is clear from the language of the regulation, then that meaning controls and "that is 'the end of the matter.'" *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)); *see Pacheco v. Gibson*, 27 Vet.App. 21, 25 (2014) (en banc). If, however, the language is ambiguous, then the Court must defer to the agency's interpretation of its regulation unless that interpretation is inconsistent with the language of the regulation, is otherwise plainly erroneous, or does not represent the agency's considered view on the matter. *Southall-Norman*, 28 Vet.App. at 351; *see Auer v. Robbins*, 519 U.S. 452, 461-62 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Smith v. Nicholson*, 451 F.3d 1344, 1349-50 (Fed. Cir. 2006).

The meaning of employment "in a protected environment" is not clear from the plain language of § 4.16. VA did not expressly define that term in the regulation and the nonexhaustive list of examples of what may constitute employment in a protected environment that VA did provide in § 4.16(a)—i.e., a family business or sheltered workshop—does not resolve this uncertainty. To the contrary, that list of examples suggests that VA may have intended employment "in a protected environment" to be a term of art that differs from the ordinary, accommodation-based dictionary definition proffered by the veteran. *See* 55 Fed. Reg. 31,579, 31,580 (Aug. 3, 1990) (agreeing with a commenter that it was necessary to clarify the definition of marginal employment when earned income exceeds the poverty threshold and providing the list

of examples rather than resorting to a dictionary definition). While family businesses and sheltered workshops often involve employment accommodations, the presence of such accommodations is not the only similarity between the two and is not even a necessary characteristic for employment in a family business. Moreover, no other VA disability compensation regulation mentions employment in a protected environment, much less defines it, and the regulations surrounding § 4.16 in the Code of Federal Regulations do nothing to elucidate the term's meaning. *See Correia v. McDonald*, 28 Vet.App. 158, 166 (2016) (examining the placement of 38 C.F.R. § 4.59 within the regulatory scheme to determine its meaning); *cf. King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991) ("[T]he meaning of statutory language, plain or not, depends on context."). Given that the language and context of § 4.16(a) "leave in doubt" the meaning of employment "in a protected environment," the Court concludes that the term is ambiguous and must decide whether VA's definition is entitled to deference. *Smith*, 451 F.3d at 1350; *see Seminole Rock & Sand Co.*, 325 U.S. at 414 (explaining that, when a court is interpreting a regulation, it "must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt").

The problem, however, is that the Secretary has refused to proffer any definition of employment "in a protected environment" for the Court to analyze. In fact, when ordered by the Court to provide one, the Secretary responded that "VA has purposely chosen not to prescribe a precise definition of 'protected environment,' allowing the factfinder to make the determination on a case-by-case basis." Secretary's Supp. Memo at 12. In the Secretary's view, this ambiguity by design is a beneficial feature of § 4.16(a), providing VA adjudicators with "the broad discretion in assessing the factual particularities of each case" that is necessary to determine whether a veteran's employment qualifies as employment in a protected work environment. *Id*. at 13. Essentially, the Secretary is asking the Court to defer to a "we know it when we see it" definition of employment in a protected environment and to trust that the hundreds of VA adjudicators across the country will uniformly and consistently apply that undefined term without guidance from the Secretary.

The flaw in this reasoning is obvious: Without a definition of the phrase or, at the very least, a list of factors that VA adjudicators should consider in making that determination, there is no standard against which VA adjudicators can assess the facts of a veteran's case to determine whether he or she is employed in a protected environment. While that determination of course requires consideration of the particular facts of each veteran's case, the Secretary's incantation in

his pleadings of the phrase "facts found" does not conjure a standard for employment "in a protected environment" or otherwise imbue that phrase with meaning. Nor does the list of examples provided in § 4.16(a) because, although the Secretary stated at oral argument that the "common thread that exists between these examples" is that the employer incurs "some type of loss" in employing the veteran, Oral Argument at 26:05-20, the Secretary steadfastly maintained— in briefing, memoranda, and oral argument before the Court—that VA adjudicators decide whether employment qualifies as "in a protected environment" based on the "facts found" in each case and that there is no defining feature or factor, including loss, that guides that case-specific assessment. *See, e.g.*, Secretary's Br. at 15-16; Secretary's Supp. Memo at 12-18; Oral Argument at 27:40-55. The Board certainly did not apply a standard of loss to the employer in this case, *see* R. at 16-17, and the Court doubts that the Board would have been able to meaningfully apply that standard, if applicable, based on the record VA developed below.

In short, absent an articulated standard for employment "in a protected environment" that is capable of consistent application by VA and meaningful review by this Court, we cannot defer to the Secretary's decision not to define that term in § 4.16(a). *See Hood v. Brown*, 4 Vet.App. 301, 303 (1993) (rejecting the Secretary's interpretation of a term in a diagnostic code that was "the equivalent of 'because I say so'"); *cf. Burlington Truck Lines, Inc., v. United States*, 371 U.S. 156, 167 (1962) ("Expert discretion is the lifeblood of the administrative process, but '[u]nless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'" (quoting *New York v. United States*, 342 U.S. 882, 884 (1951) (Black, J., dissenting))).

Although "the law does not demand perfect consistency in administrative decisionmaking," *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 103 (1st Cir. 2002), "overly ambiguous standards almost inevitably lead to inconsistent application," *King v. LaMarque*, 464 F.3d 963, 966 (9th Cir. 2006). This point is amply illustrated by VA's past experience with this very regulation. Prior to 1990, VA considered marginal employment not substantially gainful employment for TDIU purposes, but § 4.16 did not specify that fact. *See* 38 C.F.R. § 4.16 (1989); 54 Fed. Reg. 35,507, 35,508 (proposed Aug. 28, 1989) ("It has been VA policy that marginal employment is not to be considered substantially gainful employment. It is proposed to amend § 4.16(a) to define marginal employment. . . ."). In September 1987, the U.S. General Accounting

11

Office (now the Government Accountability Office) issued a report examining VA's process of determining, on a "case-by-case basis" and without overarching guidance from the Secretary, whether a veteran was engaged in marginal employment for TDIU purposes. U.S. GEN. ACCOUNTING OFFICE, IMPROVING THE INTEGRITY OF VA'S UNEMPLOYABILITY COMPENSATION PROGRAM (Sept. 21, 1987). The General Accounting Office surveyed VA adjudicators from nine ROs and "could not obtain a consistent interpretation," noting that "VA uses at least five different approaches" to answer that question. *Id*. at 4. It cautioned that VA's use of these different approaches could result in different outcomes for similarly situated veterans and give "the appearance of arbitrary and inequitable decisionmaking." *Id.* at 18, 42. Thus, to avoid such unjust and disparate treatment and to bring uniformity to VA decisionmaking in this area, the General Accounting Office recommended that VA adopt an agency-wide definition of marginal employment, *id*. at 5, which it did in August 1990, *see* 54 Fed. Reg. at 35,508 (citing the 1987 General Accounting Office report as the impetus for amending § 4.16(a)); 55 Fed. Reg. at 31,579 (final rule effective Aug. 3, 1990). Given VA's prior failures consistently applying an undefined term on a case-by-case basis to determine entitlement to TDIU, the Court has little confidence that VA has or will be able to determine employment "in a protected environment" in a consistent manner without further guidance from the Secretary.

Here, the Board determined that Mr. Cantrell's employment as a park ranger did not constitute employment "in a protected environment" because it entailed substantial responsibilities—including being allowed to carry a weapon and drive a patrol car and being required to deal with rule violators—and "the accommodations made by [his] employer have allowed him to perform his job successfully and on a full[-]time basis." R. at 17. Although the magnitude of a veteran's job responsibilities and the degree of accommodation necessary for successful, full-time work might be appropriate factors to consider in determining whether a veteran is employed in a protected environment, VA's failure to define employment "in a protected environment" or to otherwise specify the factors that adjudicators should consider in making that determination frustrates judicial review of that issue because the Court is unable to meaningfully assess the propriety of the Board's reliance on the factors it cited in this case. *See Hood*, 4 Vet.App. at 303; *Gilbert*, 1 Vet.App. at 56-57. The Court simply cannot sanction a statement of reasons or bases that amounts to finding that Mr. Cantrell was not employed in a protected environment

"because I say so." *Hood*, 4 Vet.App. at 303. Accordingly, the Court concludes that the Board provided inadequate reasons or bases for denying entitlement to TDIU, necessitating remand. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate").

To the extent that Mr. Cantrell requests that the Court define the term employment "in a protected environment" for TDIU purposes, *see* Appellant's Br. at 15; Reply Br. at 1-2, we decline to do so at this time. "It is VA's responsibility to define the terms contained within its regulations," *Ortiz-Valles*, 28 Vet.App. at 72, and, as we have done in the past when reviewing previously undefined regulatory terms, we will give VA the first opportunity to do so.[7] *See, e.g.*, *id.* (declining to define the term "substantially gainful employment" in § 4.16 and remanding with encouragement to VA to do so); *Moore v. Derwinski*, 1 Vet.App. 356, 359 (1991) (same); *Ferraro v. Derwinski*, 1 Vet.App. 326, 333 (1991) (same); *cf. Gray v. McDonald*, 27 Vet.App. 313, 326-27 (2015) (noting VA's "discretionary authority to define the scope of [a] presumption" and declining "to usurp the Agency's authority and impose its own line"); *see also Hood*, 4 Vet.App. at 304 ("The Board is statutorily mandated to provide a statement of reasons or bases for its decision. If the Board is unable to do so because of a regulation's syntax, then it may be necessary for the Secretary to change that regulation by amendment or interpretation.").

### 3. Credibility

In addition, the Court agrees with the veteran that the Board provided inadequate reasons or bases for finding his reports to the vocational expert of his ulcerative colitis symptoms to be inconsistent with his prior reports to treating physicians.

The Board's analysis of the vocational expert's opinion focuses not on the number of times that Mr. Cantrell used the restroom each workday, but rather on the amount of time that the veteran spent in the restroom each workday. Specifically, the Board noted the vocational expert's estimate

---

[7] The Court notes that VA has stated that, in addition to "income," "the frequency and type of service performed" are relevant factors in assessing whether a veteran is engaged in substantially gainful employment in a tightly held corporation. VA ADJUDICATION PROCEDURES MANUAL (M21-1), pt. IV, subpt. ii, ch. 2, § F(3)(d); *see id.* at § F(3)(c) (equating a tightly or closely held corporation with a family business). The Court notes that no attempt was made in this case either by the Secretary or the Board to apply such factors.

that, based on Mr. Cantrell's reports, he "lost 3 1/3 hours per workday to bathroom breaks," which significantly exceeded the 45 to 60 minutes of "off task" work time that, in the expert's experience, would justify reasonable termination of an employee.  R. at 16.  The Board found Mr. Cantrell's reports to the vocational expert not credible because they were "inconsistent with the rest of the record" insofar as the veteran had "not previously reported that he spends nearly half of his work shift in the restroom on days when he is not experiencing pouchitis."  R. at 17.

Although the Board is correct that Mr. Cantrell had not previously stated that he spent half of his workday in the restroom when he was not experiencing pouchitis, the record does not contain any evidence other than the March 2015 vocational expert's report in which the veteran quantified the amount of time spent in the restroom each day, as opposed to the number of bowel movements he had each day, and none of the medical records referenced by the Board addresses that matter. *See* R. at 10-12, 640, 747-60, 886-917, 1095-97, 1122-23, 1245, 1246, 1248.  In other words, the record lacks any statements as to total time spent in the restroom on a workday, and thus no statements that may be inconsistent, upon which the Board's discounting of the vocational expert's opinion was based.

Accordingly, the Court concludes that the Board failed to identify a proper foundation in the record for its adverse credibility determination, further diminishing the adequacy of its reasons or bases for denying entitlement to TDIU and justifying remand of that issue.  *See Southall-Norman*, 28 Vet.App. at 355 (holding that the Board provided inadequate reasons or bases for impugning the appellant's credibility based on inconsistencies that were not present in the record); *Fountain v. McDonald*, 27 Vet.App. 258, 273-75 (2015) (concluding that the Board erred in not adequately explaining several putative discrepancies between the appellant's lay statements and the other evidence of record); *Tucker*, 11 Vet.App. at 374; *Caluza*, 7 Vet.App. at 506; *Gilbert*, 1 Vet.App. at 57.

### B.  Extraschedular Referral

The Board generally must consider referral for consideration of an extraschedular evaluation "'[w]here there is evidence in the record that shows exceptional or unusual circumstances or where the veteran has asserted that a schedular rating is inadequate.'"  *Yancy v. McDonald*, 27 Vet.App. 484, 493 (2016) (quoting *Colayong v. West*, 12 Vet.App. 524, 536 (1999)).  In *Thun v. Peake*, 22 Vet.App. 111, 115 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d

1366 (Fed. Cir. 2009), the Court outlined the framework for determining entitlement to an extraschedular evaluation. First, the Board must determine whether the evidence "presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate." *Id.*; *see Sowers v. McDonald*, 27 Vet.App. 472, 478 (2016) ("The rating schedule must be deemed inadequate before extraschedular consideration is warranted."). This obliges the Board to compare "the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability." *Thun*, 22 Vet.App. at 115. When this requirement is satisfied, the Board must determine whether the veteran's exceptional disability picture exhibits other related factors such as "'marked interference with employment' or 'frequent periods of hospitalization.'" *Id.* at 116 (quoting 38 C.F.R. § 3.321(b)(1)). If both these inquiries are answered in the affirmative, the Board must refer the matter to the Under Secretary for Benefits or the Compensation Service Director for the third inquiry, i.e., a determination of whether, "[t]o accord justice," the veteran's disability picture requires the assignment of an extraschedular evaluation. *Id.*; *see generally Doucette v. Shulkin*, __ Vet.App. __, __, No. 15-2818, 2017 WL 877340 at *3, 2017 U.S. App. Vet. Claims LEXIS 319, at *9-10 (Mar. 6, 2017); *Todd*, 27 Vet.App. at 89-90; *Anderson v. Shinseki*, 22 Vet.App. 423, 427 (2009) (outlining the "elements that must be established before an extraschedular rating can be awarded"). In making the extraschedular referral determination, the Board must consider the collective impact of multiple service-connected disabilities whenever that issue is expressly raised by the claimant or reasonably raised by evidence of record. *See Johnson v. McDonald*, 762 F.3d 1362, 1365 (Fed. Cir. 2014); *Yancy*, 27 Vet.App. at 495; *Robinson v. Peake*, 21 Vet.App. 545, 552 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009).

Mr. Cantrell argues that the Board provided inadequate reasons or bases for denying referral for consideration of an extraschedular evaluation for his service-connected post-surgery ulcerative colitis because it did not adequately consider the reasonably raised issue of the collective impact of all his service-connected disabilities in violation of *Johnson*. Appellant's Br. at 24-28. The Secretary disputes this contention and asserts that the record did not contain evidence demonstrating that the veteran's service-connected disabilities interacted to cause an exceptional or unusual disability picture not already contemplated by the schedular evaluation criteria. Secretary's Br. at 21-24. Mr. Cantrell responds by pointing to evidence of record that allegedly

reflects that his service-connected post-surgery ulcerative colitis and hip disabilities collectively caused difficulties with standing and walking that are greater than the impairment caused by those individual disabilities alone. Reply Br. at 8-10. The Court agrees with the veteran.

Contrary to the Secretary's contention, the record before the Board reasonably raised the issue of referral for consideration of an extraschedular evaluation on a collective basis because evidence of record addressed the collective impact of Mr. Cantrell's service-connected disabilities. *See Yancy*, 27 Vet.App. at 496 (finding the issue reasonably raised because "the record contain[ed] evidence of the collective impact of [the appellant's] service-connected disabilities"). For example, evidence of record at the time of the Board decision reflected that the veteran's post-surgery ulcerative colitis symptoms of loose stools and abdominal discomfort make it difficult for him to stand, R. at 1245; his service-connected bilateral hip disabilities impair his walking, R. at 482; and, despite these difficulties, the best way for him to attain temporary relief from his symptoms is to "stand/walk about," R. at 83.

As in *Yancy*, where the Court held that the issue of the collective impact of the veteran's service-connected disabilities was reasonably raised by evidence of record that showed that the veteran could not stand or sit for long periods as a result of multiple service-connected disabilities, 27 Vet.App. at 496, the above-cited evidence that Mr. Cantrell could not stand or walk without difficulty as a result of multiple service-connected disabilities is sufficient to reasonably raise the applicability of *Johnson* in this case. *See Southall-Norman*, 28 Vet.App. at 354 (holding that the Board's failure to discuss a potentially applicable provision of law rendered inadequate its reasons or bases for its decision (citing *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991)); *Robinson*, 21 Vet.App. at 552. To the extent that the Board found otherwise because "there are no additional service-connected symptoms that have not been attributed to a specific service-connected disability," R. at 15, it did not adequately account for the foregoing evidence, which is material and potentially favorable to the veteran's claim. *See Caluza*, 7 Vet.App. at 506.

Moreover, the Board's approach in this case improperly focused on individual symptoms, rather than the collective impact of those symptoms on the veteran's overall disability picture. As the U.S. Court of Appeals for the Federal Circuit explained in *Johnson*:

> Limiting referrals for extra-schedular evaluation to considering a veteran's disabilities individually ignores the compounding negative effects that each individual disability may have on the veteran's other disabilities. It is not difficult

16

to imagine that, in many cases, the collective impact of all of a veteran's disabilities could be greater than the sum of each individual disability's impact.

762 F.3d at 1766; *see Yancy*, 27 Vet.App. at 495 (endorsing that principle). Given that the Board considered only whether Mr. Cantrell had symptoms not listed in the respective evaluation criteria for each service-connected disability and not whether those disabilities collectively caused an exceptional disability picture not contemplated by the rating schedule, the Court concludes that the Board provided inadequate reasons or bases for denying extraschedular referral. *See Yancy*, 27 Vet.App. at 496; *Gilbert*, 1 Vet.App. at 57. Remand of the extraschedular referral issue is therefore warranted. *See Tucker*, 11 Vet.App. at 374.

### III. CONCLUSION

Upon consideration of the foregoing, Mr. Cantrell's February 23, 2017, motion for leave to file a notice of supplemental authority out of time is granted.

The portions of the August 13, 2015, Board decision denying referral for consideration of an extraschedular evaluation for service-connected post-surgery ulcerative colitis and entitlement to TDIU are SET ASIDE and those matters are REMANDED for readjudication consistent with this decision. On remand, Mr. Cantrell may present any additional arguments and evidence pertinent to those matters to the Board in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for [the Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

The balance of the appeal is DISMISSED.

LANCE, *Judge*, concurring: I fully join the Court's opinion and concur that we should not defer to the Secretary's "facts found" definition of "protected environment," as that standard is essentially non-reviewable. I also agree that the Secretary should be afforded the first opportunity to clarify his regulation. I write separately to raise two issues regarding the nature of a "protected environment."

First, although the TDIU regulation provides that income below the poverty threshold constitutes "marginal employment," *see* 38 C.F.R. § 4.16(a), I believe that a claimant's income—

17

and, specifically, whether the claimant receives the same pay as similarly situated coworkers who are not disabled—is also a factor relevant to whether the claimant is employed in a protected environment. VA disability ratings are "based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations," 38 U.S.C. § 1155, and "are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability," 38 C.F.R. § 4.1 (2016). An award of TDIU under § 4.16(a) merely provides an alternative avenue for a veteran to obtain a total disability rating. If a claimant's disabilities do not result in lost income, then there is no loss of earning capacity, and an award of TDIU would not be appropriate.

Second, I believe the Secretary should be mindful of the Americans with Disabilities Act (ADA) when formulating his definition of "protected environment," especially its mandate that employers provide reasonable accommodations for individuals with disabilities such as "job restructuring, part-time or modified work schedules, . . . [and] acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(B). Where a claimant's employer is required by law to provide reasonable accommodations pursuant to the ADA and those accommodations allow the claimant to engage in a substantially gainful occupation, a TDIU award would, in effect, constitute a second paycheck on the back of the taxpayer.

TDIU awards serve an important role in ensuring that veterans who are unable to work due to their service-connected disabilities are properly compensated. Where, however, a veteran's disabilities do not result in lost income or where legally required accommodations permit a veteran to maintain gainful employment, an award of TDIU does not serve its intended purpose. I believe the Secretary would be well served to keep these issues in mind as he considers how to define "protected environment."