# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-3808

WILLIE S. JOHNSON, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 24, 2018                                    (Decided September 19, 2018)

*Raymond J. Kim,* with whom *Barton F. Stichman*, and *Patrick A. Berkshire*, all of Washington, D.C., were on brief for the appellant.

*Sara E. Wolf,* with whom *Meghan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Selket N. Cottle*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and SCHOELEN and ALLEN, *Judges*.

DAVIS, *Chief Judge*, filed the opinion of the Court. ALLEN, *Judge*, filed a concurring opinion.

DAVIS, *Chief Judge*: U.S. Marine Corps veteran Willie S. Johnson suffers from headaches. He appeals through counsel an August 10, 2016, decision of the Board of Veterans' Appeals that denied an initial disability rating in excess of 30% for mixed headaches. Mr. Johnson argues that he meets all the criteria for a 50% rating, which requires "very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability." 38 C.F.R. § 4.124a, Diagnostic Code (DC) 8100 (2018). He attacks the Board's reasons or bases for finding otherwise, faulting the Board for not defining "very frequent," and he challenges the evidentiary bases for the Board's finding that his headaches were neither prolonged nor completely prostrating.

In this appeal, the panel is principally concerned with whether DC 8100 contains "successive rating criteria" throughout the regulation, which would require Mr. Johnson to satisfy each and every criterion listed for a 50% disability rate. The concept of successive rating criteria is a limited exception to the general regulatory structure, in which "it is not expected . . . that all cases will show all the findings specified [in the applicable DC]." 38 C.F.R. § 4.21 (2018).

Moreover, as a general matter when considering rating criteria, "the higher evaluation will be assigned if the disability picture [of the claimant] *more nearly approximates* the criteria required for that rating." 38 C.F.R. § 4.7 (2018) (emphasis added). Additionally, when a "reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant." 38 C.F.R. § 4.3 (2018).

In *Pierce v. Principi*, 18 Vet.App. 440 (2004), a veteran suffering from headaches was seeking a 50% disability rating under DC 8100. He argued that the Board erred when it failed to address these general regulatory provisions, namely § 4.3 (reasonable doubt), § 4.7 (higher of two ratings), and § 4.21 (all elements of rating schedule need not be present). The Court agreed and remanded the case for the Board to discuss the interplay among §§ 4.3, 4.7, and 4.21 with respect to the disability rating under DC 8100.

Subsequently, however, the Court held that this general regulatory framework does not apply to all DCs. In *Camacho v. Nicholson*, 21 Vet.App. 360, 366 (2007) the Court held that § 4.21, and presumably §4.7, does not apply to DC 7913, the DC for diabetes. In *Tatum v. Shinseki*, 23 Vet.App. 152, 156 (2009), the Court explained that the DC for diabetes involved successive rating criteria, such that each incremental rating included the requirements of the next lower rating, with the result that all requirements must be met to attain the higher rating. Since *Tatum* and *Camacho*, various Board decisions have asserted, as the Board did in this case, that the rating criteria for DC 8100 (migraine headaches) are successive, rendering § 4.7 (and likely § 4.21) inapplicable. The Court has not considered this matter in a precedential decision.

For reasons discussed below, the Court concludes that the Board was correct that DC 8100's rating criteria are successive, rendering 38 C.F.R. §§ 4.7 and 4.21 inapplicable. In contrast, we conclude that § 4.3 remains applicable to DC 8100. Because the Board's analysis lacks definitions of the terms in that DC, however, the Court's review is frustrated, requiring a remand for an adequate statement of reasons or bases.

## I. PARTIES' ARGUMENTS

### A. Mr. Johnson challenges the sufficiency of evidence and reasoning in the Board's decision.

In his primary brief, Mr. Johnson argued that the Board's reasons or bases are inadequate to facilitate review in this Court. He pointed first to the Board's summary of his symptoms as reflected in the medical evidence of record. The Board noted that an October 2010 VA examiner

stated that Mr. Johnson experienced headaches two or three times per month, with each headache lasting from minutes to hours, and that after Mr. Johnson took medication for a headache he had to stop what he was doing. Record (R.) at 6. The examiner also stated that Mr. Johnson was "[u]nable to perform any task with prostrating headaches, 3 per month, lasting hours." R. at 525.

Based on this summary, Mr. Johnson vigorously challenged the Board's finding that "[w]hile three times a month may be deemed frequent, the Board finds that it does not equal very frequent." R. at 7. He argued that the Board failed to explain how it had reached that conclusion and offered no reason for departing from the *VA Adjudication Procedures Manual* (M21-1), which defines "very frequent" as follows: "Duration of characteristic prostrating attacks, on average, are *less than one month apart* over the last several months."  M21-1, pt. III, subpt. iv. 4.G.7.f. (June 15, 2015) (emphasis added).

Mr. Johnson further faulted the Board for failing to explain its finding that his headaches were not "prolonged." He observed that the Board neither defined "prolonged" nor explained why headaches lasting hours were not prolonged. Additionally, Mr. Johnson challenged the Board's use of his description of his headaches as "prostrating" rather than "completely prostrating." R. at 368. He pointed to the October 2010 VA examination report stating that he was unable to perform "any task" while suffering from his headaches, R. at 525, and faulted the Board for parsing the words of a legally unsophisticated veteran while ignoring the medical evidence of record.

Further, he argued that the Board did not appropriately consider evidence that he took unpaid leave under the Family Medical Leave Act (FMLA), R. at 368, 489, reflecting that the headaches were sufficiently prolonged to require leave from work. He reasoned that if the headaches were only for short periods of time, there would be no reason to resort to FMLA leave and thus, this evidence is relevant to whether the attacks are prolonged. R. at 368.

**B. The Secretary asserts that the Board's reasoning and assessment of the evidence of record are sufficient.**

The Secretary argued for affirmance of the Board decision, asserting that the Board's statement of reasons or bases was adequate to support its determination of a 30% disability rating. He noted that the M21-1 provision defining "very frequent" does not bind the Board. *See DAV v. Sec'y of Veterans Affairs*, 859 F.3d 1072, 1077 (Fed. Cir. 2017). The Secretary did not suggest, however, what alternative definition of "very frequent" the Board may have employed.

The Secretary noted that the Board employed "utter physical exhaustion or helplessness"

as the nonmedical definition of "prostrating." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 1080 (3d ed. 1986), and a medical definition "extreme exhaustion or powerlessness," *Dorland's Illustrated Medical Dictionary* 1554 (31st ed. 2007), but the Secretary did not explain how the Board may have construed "characteristic prostrating attacks," as distinguished from "completely prostrating attacks."

The Secretary further defended the Board's determination that the attacks were not prolonged, noting that the Board's relied on medical evidence revealing that the attacks lasted from minutes to hours. The Secretary did not suggest what definition of "prolonged" the Board may have employed. The Secretary further argued that Mr. Johnson has not established that the use of FMLA leave pertained to the duration of his attacks, as opposed to their frequency.

**C. The parties disagree on whether DC 8100 contains successive rating criteria.**

In a supplemental briefing order, the Court directed the parties to discuss whether DC 8100 contains successive ratings. The Court further sought briefing whether a conclusion that DC 8100 did contain successive ratings would create a conflict with *Pierce*, requiring an en banc decision.

In response, Mr. Johnson stated that "rating criteria are successive where the criteria for different rating percentages overlap or share the same criteria such that entitlement to a higher rating necessarily establishes entitlement to a lower rating precisely because of the overlap between the criteria." Appellant's Amended Supplemental Brief (Br.) at 2. With respect to DC 8100, he stated that the criteria for 10% and 30% disability ratings are successive, and conceded that, with respect to those ratings an analysis of the interplay among §§ 4.3, 4.7, and 4.21 would not be required. *Id*. at 5.

But Mr. Johnson concluded that it is "debatable" whether the criteria for 30% and 50% are successive. *Id*. at 8. He pointed out that the terminology used in the 50% rating differs from that of the lower ratings, and argued that, had the Secretary intended the rating criteria to be successive, he could have repeated the "characteristic prostrating attacks" language in the 50% disability rating. Nevertheless, Mr. Johnson acknowledged that the "very frequent" attacks in the 50% rating might subsume the "once a month" frequency of the 30% rating, and that "completely prostrating" may be intended to "encompass and exceed the 'characteristic prostrating attacks' required for a 30% rating." *Id.* at 5-6.

The Secretary stated that rating criteria are successive if "'the evaluation for each higher disability rating include(s) the criteria of each lower disability rating, such that if a component was

4

not met at any one level, the veteran could only be rated at the level that did not require the missing component.'" Secretary's Supplemental Br. at 3 (quoting *Tatum*, 23 Vet.App. at 156). The Secretary concluded that DC 8100's rating criteria are successive and conjunctive, requiring a claimant to demonstrate all the requirements of a given disability rating. He reasoned that "very frequent" in the 50% rating must mean frequency greater than the once-a-month frequency the 30% rating requires. He further reasoned that "an attack cannot be <u>completely</u> prostrating without it also being prostrating, and an attack cannot be <u>prolonged</u> without it having first occurred." *Id.* at 8 (emphasis in original). He concluded that §§ 4.7 and 4.21 are inapplicable to DC 8100. The Secretary further noted, however, that the applicability of § 4.3, concerning the resolution of reasonable doubt in the veteran's favor, did not depend on whether the rating criteria were successive, but that there would be no reasonable doubt to resolve if the claimant did not meet all the requirements of a successive rating criterion.

Finally, the parties agreed that a decision that DC 8100 involves successive criteria would not conflict with *Pierce*. The parties assert that *Pierce* may be distinguished on the basis that the Board in that case did not discuss the requirements of §§ 4.3. 4.7, and 4.21, but the Board in Mr. Johnson's case considered these regulations, and found them inapplicable because the rating criteria were successive.

## II. ANALYSIS

The central legal question in this appeal is whether DC 8100 sets forth successive rating criteria. We conclude that it does. Before explaining why we reach this conclusion, we canvass the state of the law concerning successive rating criteria.

### A. Caselaw establishes distinct requirements for successive rating criteria.

In *Camacho*, the Court rejected the appellant's contention that he need not demonstrate all the requirements (insulin + restricted diet + regulation of activities) for a 40% disability rating under DC 7913, the DC for diabetes. The Court stated that "[in] light of the conjunctive 'and' in the criteria for a 40% disability rating under DC 7913, all criteria must be met to establish entitlement to a 40% rating," and held that § 4.21 was inapplicable. 21 Vet.App. at 366. The Court further reasoned that "if taking insulin and having a restricted diet were sufficient to support a 40% disability rating without restriction of activities, then there would be no reason for 'insulin and restricted diet' to be one of the two ways to qualify for a 20% disability rating." *Id.* at 366-67. The

5

Court concluded that the appellant's argument must be rejected because it would render part of the regulation superfluous. *Id.* at 367.

In *Tatum*, the appellant, who was rated 10% and was seeking a 30% disability rating for hyperthyroidism under DC 7903, argued that he met two of the three requirements for a 30% disability rating, and that the Board erred when it failed to consider whether he was entitled to the higher of two ratings under § 4.7. The Secretary, citing *Camacho*, asserted that the conjunctive "and" in the 30% disability rating similarly required fulfillment of all the rating criteria. But the *Tatum* Court made clear that the Secretary's reliance on the use of the conjunctive "and" as discussed in *Camacho* was misplaced. 23 Vet.App. at 155. The Court explained that DC 7913 contained "successive rating criteria," where "the evaluation for each higher disability rating included the criteria for each lower disability rating, such that if a component was not met at any one level, the veteran could only be rated at the level that did not require the missing component." *Id.* at 156. The Court contrasted DC 7913 with DC 7903, under which "a veteran could potentially establish *all* of the criteria required for a 30% or a 60% disability rating without establishing *any* of the criteria for a lesser disability rating." *Id.* (emphasis in original). The Court warned that requiring a claimant to demonstrate all the rating requirements "when the criteria for a higher disability rating are variable and not merely cumulative" would "eviscerate the meaning" of §§ 4.7 and 4.21. *Id.* Thus, *Tatum* illustrates that the use of the conjunctive "and" does not automatically mean that a claimant must demonstrate all the rating criteria in a DC.

The U.S. Court of Appeals for the Federal Circuit considered DC 7913 and successive criteria in *Middleton v. Shinseki*, 727 F.3d 1172 (Fed. Cir. 2013): "We agree that the enumerated elements of DC 7913 required for a 40% rating are part of a *structured scheme of specific, successive, cumulative, criteria* for establishing a disability rating: each higher rating includes the same criteria as the lower rating plus distinct new criteria." *Id.* at 1178 (emphasis added). The Federal Circuit further discussed the conjunctive "and" in DC 7913, concluding that "[f]or the distinction between the ratings in this successive code to have any significance, we must give meaning to the 'and' in the higher rating." *Id.*

Viewing the cases discussed above, the Court concludes that to determine whether a DC contains successive rating criteria the Court must consider three factors. The first factor is the degree to which the criteria in lesser disability ratings are repeated or incorporated into the higher disability rating under consideration. The second is whether awarding a disability rating on less

than all the rating criteria would render a lesser disability rating superfluous. Stated another way, the Court must consider whether a claimant can fulfill the criteria of the higher rating without fulfilling those of the next lower rating. The third factor is whether the higher rating employs a conjunctive "and" in a manner that signals bundling of all the rating factors in that disability rating. The Court must consider these factors in assessing whether the Secretary's regulation is a "structured scheme of specific, successive, cumulative, criteria."

## B. The Court concludes that DC 8100 contains successive rating criteria throughout the regulation.

DC 8100 is structured differently than the DC this Court and the Federal Circuit determined to be successive, DC 7913. *See Middleton*, 727 F.3d at 1178; *Camacho*, 21 Vet.App. at 366. That DC can be thought of as constructed of identical building blocks so that at 10% one must establish A, at 20% A and B, at 30% A, B, and C, and so forth. Such a construction—in which the language corresponding to a lower rating also appears verbatim in the next higher rating, with the higher rating using the conjunctive "and" to join the added language of the higher rating—certainly is the most direct means by which to construct successive rating criteria. It may even be the best practice. But we see no reason to find successive ratings only where each higher rating incorporates and repeats verbatim the language from all lower ratings. Instead, we believe that the general principles we have set out above may be used to assess whether any given DC is successive.

DC 8100 provides the following disability schedule:

| | |
|---|---|
| With very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability | 50[%] |
| With characteristic prostrating attacks occurring on average once a month over last several months | 30[%] |
| With characteristic prostrating attacks averaging one in two months over last several months | 10[%] |
| With less frequent attacks | 0[%] |

38 C.F.R. § 4.124a, Diagnostic Code (DC) 8100 (2018).

The challenge we confront in assessing DC 8100 is that several words and phrases are not defined and at various rating levels different terms are used to label similar concepts. For example,

in terms of severity, DC 8100 does not define "characteristic prostrating attacks" or "completely prostrating and prolonged attacks." Similarly, with respect to frequency, the DC does not define "frequent" or "very frequent," or otherwise distinguish those concepts. These definitional challenges do not, however, mean DC 8100 is ambiguous with respect whether its ratings are successive. These challenges mean only that making this determination is more complex than it otherwise would be. *See Atencio v. O'Rourke*, 2018 U.S. App. Vet. Vet. Claims LEXIS 890, at \*14 (July 6, 2018) (noting that complexity and ambiguity are distinct concepts in regulatory interpretation).

The Court reviews the interpretation of regulations de novo. *See Tropf v. Nicholson,* 20 Vet.App. 317, 320 (2006). The Court begins by examining the language of the regulation. *See Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute [or regulation] is its language."); *Goodwin v. Shulkin,* 870 F.3d 1383, 1386 (Fed. Cir. 2017) (stating that the rules of statutory construction apply to interpretation of regulations); *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."). If the plain meaning of the regulation is clear from its language, then that meaning controls, and "that is 'the end of the matter.'" *Tropf,* 20 Vet.App. at 320 (quoting *Brown v. Gardner,* 513 U.S. 115, 120, (1994)). A fundamental canon of regulatory construction is that when interpreting a regulation, the words of the regulation are given "their ordinary, contemporary, common meaning," absent an indication that the words "bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431, 435 (2000)*; Perrin v. United States,* 444 U.S. 37, 42 (1979) (stating that "words [in a regulation], unless otherwise defined, will be interpreted as taking their ordinary, contemporary, common meaning"); *Prokaryn v. McDonald*, 27 Vet.App. 307, 310 (2015) ("In the absence of an express definition words are given their ordinary meaning.").

Applying to DC 8100 these garden-variety principles of interpretation and our caselaw on successive rating criteria, the Court holds DC 8100's rating criteria are successive. DC 8100 governs migraine headaches and provides a 10% disability rating for "characteristic prostrating attacks averaging one in [two] months over last several months" and a 30% rating for "characteristic prostrating attacks occurring on an average once a month over last several months." The words "characteristic" and "prostrating" are used in both the 10% and 30% rating levels. However, neither term is defined in the regulation.

"Characteristic" is "a trait, quality, or property or a group of them distinguishing an individual, group, or type." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 376 (1966) [hereinafter " WEBSTER'S"]. "Prostrating" means "lacking in vitality or will: powerless to rise: laid low." *Id*. at 1822. Because DC 8100 specifically governs migraine headaches, the phrase "characteristic prostrating attacks" plainly describes migraine attacks that typically produce powerlessness or a lack of vitality. The distinction between the 10% and 30% disability levels is the frequency of the headaches. A 10% disability rating is warranted when the prostrating headaches occur *once* every *2 months* and 30% is warranted when the prostrating headaches occur *once a month*. Therefore, under DC 8100, headaches that are more frequent are associated with the higher rating.[1] This regulatory structure fits quite comfortably into the three factors relevant to the successiveness inquiry: (1) "Prostrating headaches required by the lower disability levels are also required by the higher ones; (2) a claimant cannot fulfill a higher level without establishing everything required by lower levels; and (3) there is a conjunctive "and" that signals the bundling of the factors employed at each level. This conclusion holds as we consider the highest rating available, 50%.

A 50% disability rating is warranted for "very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability." At oral argument, the appellant argued that because the terminology in the 50% rating level differs from that of the 10% and 30% levels, DC 8100 is not wholly successive.[2] In his brief, he argued that if the Secretary had used "characteristic prostrating attacks" in the 50% rating criteria, then there would be overlapping criteria throughout the DC." Appellant's Supplemental Br. at 3. But the appellant fails to recognize that "prostrating headaches" is a common phrase that is used throughout the DC. Notably, the difference between the 50% disability rating and the lower disability ratings is that "completely" modifies "prostrating headaches" in the 50% rating while "characteristic" modifies "prostrating headaches" in the lower ratings. "Completely" is defined as "to complete degree: entirely."

---

[1] At oral argument, Mr. Johnson's counsel distinguished between headaches occurring once a month on average, which he pointed out could include months with no headaches, and "very frequent" headaches, which he apparently interpreted to mean a pattern of headaches in excess of once a month, each month, without variation. The Court discerns no basis in the language of the regulation for distinguishing an intermittent pattern of headaches and a consistent pattern, so long as the frequency requirements are met.

[2] At oral argument, the Secretary conceded the possibility that a DC could be partially but not completely successive. Although that is a possibility for consideration in future cases, given our conclusion that DC 8100 is fully successive, we need not consider that possibility with respect to DC 8100.

WEBSTER'S at 465. This change signals that the nature of the headaches for the 50% criteria is more severe than that for the lower ratings. The salient feature of the 50% rating is that the headache attacks must be "completely prostrating." In other words, the headaches must render the veteran *entirely* powerless. Because headaches that are "completely" prostrating necessarily subsume headaches that are "characteristically prostrating," the higher 50% rating includes the same criteria as the lower ratings.

The 50% rating level also includes additional distinct criteria that are not found elsewhere in the DC. To satisfy the 50% rating criteria, the headache attacks must occur "very" frequently. Though the 10% and 30% ratings specify the number of headaches that must occur within a specific period, the 50% rating does not provide this level of detail. Yet, the phrase "very frequent" connotes a frequency greater than once a month, which is enumerated in the 30% rating level, and once every 2 months, which is enumerated for the 10%. Additionally, because the 50% rating requires "very frequent completely prostrating *and* prolonged attacks productive of severe economic inadaptability," the use of the conjunctive "and" makes clear that the headaches must be long in duration. (emphasis added). *See Comacho,* 21 Vet.App. at 366 (use of the conjunctive "and" in a DC means that "all criteria must be must to satisfy" a particular rating). "Prolong" is defined as "to lengthen in time: extend duration: draw out: continue, protract." WEBSTER'S at 1815. Finally, the 50% rating criteria requires the headaches to produce or be capable of producing "severe economic inadaptability." *See Pierce,* 18 Vet.App. at 445 (adopting the Secretary's interpretation of the phrase "productive of severe economic inadaptability" as meaning either "producing" or capable of producing" severe economic inadaptability).

DC 8100 has all the hallmarks required of successive rating criteria under the law. In sum, each disability level builds on another in terms of duration and frequency, requiring that a veteran rated at a higher level to satisfy all the requirements of the lower levels. And because this is the case, §§ 4.7 and 4.21 do not apply to this regulation. However, we agree with the Secretary that § 4.3 concerning the resolution of reasonable doubt does apply to a DC even when its rating criteria are successive. There is no reason why VA would not resolve reasonable doubt in favor of a veteran just because a given DC is successive. Unlike §§ 4.7 and 4.21, § 4.3 presents nothing that is incompatible with the nature of successive rating criteria.

Further, the Court agrees with the parties that this holding does not conflict with *Pierce*, which only required that the Board discuss the applicability of §§ 4.7 and 4.21 and their interplay

10

with § 4.3. That discussion was obviated in this case by the Board's finding, which the Court now affirms, that DC 8100 contains successive rating criteria.

These conclusions do not end the matter. We must still address the appellant's arguments that the Board's decision is deficient even if DC 8100 has successive rating criteria.

### C. The Board's statement of reasons or bases is inadequate because it lacked definitions of key terms.

As with any finding on an issue of material fact or law, the Board must support its assignment of a disability evaluation with a statement of reasons or bases that enables a claimant to understand the precise basis for its decision and facilitates review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990). The statement of reasons or bases must explain the Board's reasons for discounting favorable evidence, *Thompson v. Gober*, 14 Vet.App. 187, 188 (2000), discuss all issues raised by the claimant or the evidence of record, *Robinson v. Peake*, 21 Vet.App. 545, 552 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1335 (Fed. Cir. 2009), and discuss all provisions of law and regulation where they are made "potentially applicable through the assertions and issues raised in the record." *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991). In this case, the Board's statement of reasons or bases is inadequate in several respects.

First, the Board did not explain how some of its conclusions were consistent with the evidence of record. The Board found that "[t]he [v]eteran's headaches manifest as characteristically prostrating that occur on average once a month." R. at 3. A review of the record does not support this finding. Specifically, the report of the September 2012 examination noted some recent decrease in frequency of headaches, but stated that "[u]sual occurrences range from once every 6-21 days." R. at 417. Neither end of this range results in an average of once a month. The October 2010 examination report stated that the frequency was 2 to 3 times per month over the previous 12 months. *See* R. at 524. Furthermore, there appears to be another inconsistency between the Board's discussion and the report of the September 2012 examination. *Compare* R. at 8 ("The examiner noted that the [v]eteran did *not* have characteristic prostrating headaches.") (emphasis added) *with* R. at 419-20 (examiner responded in the affirmative to the question: "Does the [v]eteran have characteristic prostrating attacks of migraine headache pain?"). The Court is unable to assess how this discrepancy might have affected the Board's determinations.

More fundamentally, DC 8100 is rife with subjective terms of degree, the standards for which are undefined in the Board's discussion or anywhere in the regulatory structure. The Board stated that "[w]hile three times a month may be deemed frequent, the Board finds it does not equal very frequent." R. at 7. The Board also found that the headaches were not "completely prostrating" despite the October 2010 report stating that he is "unable to perform any task with prostrating attacks." R. at 524. Finally, the Board concluded that the headaches were not "prolonged" when the evidence stated that they lasted from 15 minutes to "hours," R. at 417, 524, and that he took leave under the FMLA, at least through 2011.[3] R. at 489.

Without a standard for comparing and assessing terms of degree, such conclusory findings are unreviewable in this Court. Furthermore, a Board member's dogmatic pronouncement of bare conclusions for a decision denying a claim for a rating increase under DC 8100 prevents a veteran from assessing what his or her evidence must demonstrate, and virtually guarantees inconsistent results. At oral argument, the Secretary maintained that the Board may determine whether the "very frequent" requirement is met without disclosing what benchmark it employed to reach that conclusion. The Court rejects the Secretary's position that the Board may make such determinations without any obligation to disclose the standard under which it is operating. It is unacceptable for the Court to be placed in the position of accepting the Board's determination that Mr. Johnson's headaches do not meet the requirements of DC 8100 "because I say so." *See Cantrell v. Shinseki*, 28 Vet.App. 382, 392 (2017) (citing *Hood v. Brown*, 4 Vet.App. 301, 303 (1993)).

The Court also rejects the Board's reasoning that it can employ Mr. Johnson's statement that his headaches were "prostrating" rather than "completely prostrating" as evidence pertaining to the degree of severity of his headaches. There has been no showing that, as a layperson, he was aware of the legal distinction between those terms or used the term "prostrating" advisedly. "[A] sympathetic reading of [a veteran's] pleadings cannot be based on a standard that requires legal sophistication beyond that which may be expected of a lay claimant." *Ingram v. Nicholson*, 21 Vet.App. 232, 256 (2007).

The foregoing deficiencies require remand. *See Allday v. Brown*, 7 Vet.App. 517, 527 (1995); s*ee also Tucker v. West*, 11 Vet.App. 369, 374 (1998). Given this conclusion, the Court

---

[3] In his reply brief, Mr. Johnson points to his statement concerning FMLA leave in his Form 9 appeal as demonstrating that he currently invokes the FMLA. *See* R. at 368. It is unclear from that document, however, whether he continues to use the FMLA in his latest position as a correctional officer.

will not now address appellant's other arguments focused on the adequacy of the Board's statement of reasons or bases.[4] *See Best v. Principi*, 15 Vet.App. 18, 20 (2001) (per curiam order). On remand, Mr. Johnson is free to submit additional evidence and argument, and the Board is required to consider any such relevant evidence and argument. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002); *see also Clark v. O'Rourke*, 30 Vet.App. 92, 99 (2018).

### III. CONCLUSION

On consideration of the foregoing, the Court AFFIRMS the Board's August 10, 2016, determination that DC 8100 contains successive criteria; SETS ASIDE the decision denying entitlement to a disability rating of 50% for headaches; and REMANDS that matter for readjudication that addresses the evidentiary and definitional problems discussed in this decision.

ALLEN, *Judge*, concurring: I join the opinion of the Court in full. I write separately to underscore a disturbing agency practice this appeal illustrates. That practice is both unacceptable and unlawful.

In this case, the Board denied the appellant's claims, in part, because it concluded that his headaches were neither "very frequent" nor "prolonged." R. at 7. Both of these concepts are important to the assignment of an appropriate rating for headaches, *see* 38 C.F.R. § 4.12a, Diagnostic Code (DC) 8100 (2018). But neither is defined in statute or VA regulation. The absence of such definitions is troubling alone. More concerning still, however, is that despite the centrality of these terms to the Board's decision in the appellant's case, the Board itself did not define either term. The Court correctly holds that the Board's failure to define such terms rendered its statement of reasons and bases inadequate. *See ante* at II C. I fully agree. I expound on this point because an adjudicatory system cannot abide the way the Board proceeded in this case.

The law that frames this matter is clear. Under the Due Process Clause, a claimant has a constitutionally protected property interest in VA benefits from the moment of application. *Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009). "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by

---

[4] As noted above, the appellant also argued that the Board's reasons and bases are inadequate because the Board did not discuss the definition of "very frequent" set forth in M21-1. Given the Court's resolution of the appeal, the Court need not explore here the scope of the Board's obligations to consider potentially relevant provisions of M21-1.

notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

The Board's refusal to define "very frequent" and "prolonged" is inconsistent with the Constitution's promise of due process in at least two respects. First, without a definition a veteran will have no means of knowing what he or she must establish in order to receive a benefit. It cannot possibly be the case that a claimant can be told he or she "loses" when the claimant is not first told what he or she must do to "win." There is no meaningful notice, making the right to be heard illusory. Second, without the Board defining the critical terms it uses to deny a benefit to a claimant, this Court cannot provide meaningful judicial review. Such review was a cornerstone of what Congress sought to create with the passage of the Veterans Judicial Review Act (VJRA) nearly 30 years ago. The Board's actions undermine the very system of judicial review Congress created in the VJRA to protect veterans' rights.

A simple illustration drives these points home. Assume that I asked an observer this question: "Am I tall?" The observer responds: "No, you are not tall." It is only possible to assess whether the observer is correct – or perhaps more aptly, not clearly erroneous – if the observer tells us what he or she understands "tall" to be. If the observer says the definition of "tall" is the height of my best friend (who is over 6 feet), the answer is not clearly erroneous (I'm just over 5 feet, 9 inches). If, on the other hand, the observer said "tall" meant the height of my best friend's 9-year old daughter (who is about 4 feet, 5 inches), the conclusion that I was not "tall" is clearly wrong. You can't tell whether the observer is correct, or not clearly erroneous, without knowing how the observer defined "tall."

Moreover, we know for certain that our fictional observer must have defined the term "tall" in order to have answered the question. If the observer did not do so, the answer "no" would have been standard-less. In the vocabulary of administrative law, the observer's actions would have been arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

What the Board did here is akin to the hypothetical observer who would not tell us what "tall" means. Let's just consider the Board's conclusion about frequency. The Board's entire explanation for its conclusion that three headaches per month did not qualify was as follows: "While three times a month may be deemed frequent, the Board finds it does not equal very frequent." R. at 7. Why is this so? There is no one who knows other than the Veterans Law Judge (VLJ) who decided the case, and he isn't telling. There is no scenario under which this conundrum

14

leads to any conclusion other than that the Board proceeded unlawfully. On the one hand, the VLJ could have had a definition of "very frequent" but didn't provide it to the appellant (or the Court). In that case, there is a due process violation because there is no notice. *See, e.g.*, *Armstrong v. Manzo*, 380 U.S. 545, 551-52 (1965); *Mullane*, 339 U.S. at 313. Or perhaps the Board had no definition after all, something that would make its decision arbitrary and capricious. As I noted, an adjudicatory system cannot run in this manner, especially one designed to be pro-claimant. The Board must do better.[5]

---

[5] I note that there is a further constitutional issue the lack of clear definitions raises. Even if individual VLJs provided definitions for undefined terms, there is no guarantee that those definitions would be consistent. Board decisions are not binding except in connection with a specific claim. *See* 38 C.F.R. § 20.1303 (2018). Thus, it could be that one VLJ defines "very frequently" to be more than three headaches in a month while another determines that it is more than five. This is independently problematic. The Court today does not face that issue, but I fear it will need to address it someday.