# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-0781

EDDIE D. RAY, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued September 5, 2018                                        Decided March 14, 2019)

*Barbara J. Cook*, with whom *April Donahower*, was on the brief both of Providence, Rhode Island, for the appellant.

*Amanda Radke*, with whom *Angela-Marie C. Green*, Appellate Attorney; *James M. Byrne*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Edward V. Cassidy, Jr.*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before SCHOELEN, ALLEN, and TOTH, *Judges*.

ALLEN, *Judge*, filed the opinion of the Court. TOTH, *Judge*, filed an opinion concurring in part and concurring in the judgment.

ALLEN, *Judge*: In July 2014, the Board of Veterans' Appeals (Board) referred U.S. Army veteran Eddie D. Ray's claim for a rating of total disability on the basis of individual unemployability (TDIU) to what is today the Director, Compensation Service, for extraschedular consideration. The Board found that "[w]hile [an October 2011] VA examiner indicated that the Veteran was able to perform sedentary employment, the record suggests that the Veteran may not be able to obtain such employment as it is inconsistent with his education and occupational background."[1] The Director then denied the veteran an extraschedular TDIU rating, and the matter returned to the Board.[2] Though in July 2014 the Board found extraschedular referral warranted and though no new evidence had been submitted since its July 2014 decision, in a February 15, 2017, decision, the Board found that the veteran's "service-connected disabilities do not render

---

[1] Record (R.) at 1478.

[2] R. at 45.

him unable to secure and follow a substantially gainful occupation consistent with his education and special training" and denied him an extraschedular TDIU rating.[3] Nowhere in its decision did the Board explain what it understood the phrase "unable to secure and follow a substantially gainful occupation,"[4] a phrase that VA has refused to define since this Court's inception, to mean. Nor did the Board explain why referral for extraschedular consideration was warranted in July 2014 but an extraschedular rating wasn't warranted in February 2017.

We are called on to answer two questions in this appeal, which is timely and over which the Court has jurisdiction.[5] First, what is the effect, if any, of the Board's determination to refer a case for extraschedular consideration under 38 C.F.R. § 4.16(b) when the Board later reviews the Director's decision not to award an extraschedular TDIU rating? Second, does VA's refusal to define key terms in § 4.16(b) make the Board's statement of reasons or bases inadequate, and if so, should the Court interpret those terms itself?

First, we hold that the Board's initial finding that extraschedular referral is warranted is a factual one but is necessarily based on a evidentiary threshold that is lower than that for the decision to award an extraschedular rating. If the Board refers a claim to the Director for extraschedular consideration and the Director denies an extraschedular rating, the Board's earlier decision to refer the claim doesn't automatically bind the Board to grant an extraschedular rating; however, if the Board denies an extraschedular rating, it must provide adequate reasons or bases for deviating from its earlier referral decision. Second, we hold that VA's refusal to define key terms in 38 C.F.R. § 4.16(b) frustrates judicial review and, after concluding that we needn't defer to the Secretary's interpretation of the regulation, we interpret it ourselves. Because the Board failed to explain why the evidence was sufficient to support referral but insufficient to support the award of an extraschedular rating, and because VA's refusal to define the relevant regulatory terms frustrates judicial review, we remand this matter to the Board for readjudication consistent with this opinion.

---

[3] R. at 8.

[4] The regulation uses the phrases "substantially gainful employment" and "substantially gainful occupation." These phrases are synonymous. *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 70 (2016).

[5] *See* 38 U.S.C. §§ 7252(a), 7266(a).

## I. FACTS AND PROCEDURAL HISTORY

The veteran served honorably from November 1966 to November 1969[6] and is service connected for several disabilities with a combined disability rating of 50%.[7] In September 2005, the veteran filed a claim for an increased rating due to TDIU.[8] That claim was denied in January 2006 and the denial continued in July of that year.[9]

In January 2011, the veteran submitted a VA Form 9, stating he couldn't work because of his disabilities.[10] In March 2012 the veteran's claim for TDIU was denied.[11] The veteran timely disagreed with that decision,[12] and VA continued its denial in November 2012.[13] The veteran then perfected an appeal to the Board.[14]

In a July 2014 decision, the Board remanded the issue of entitlement to TDIU to a regional office (RO) for referral under § 4.16 to the Director for extraschedular consideration.[15] In short, the Board referred the TDIU issue for extraschedular consideration. The Director denied entitlement to TDIU in March 2015,[16] and the RO continued its denial that same month. The veteran then perfected an appeal to the Board, which also denied him an extraschedular rating because his "service-connected disabilities do not render him unable to secure and follow substantially gainful employment consistent with his education and special training."[17] This appeal followed.

---

[6] R. at 4761, 4771-72.

[7] R. at 1610-11.

[8] R. at 2320-21.

[9] R. at 2288-92 (Jan. 2006 rating decision), 2249-56 (July 2006 rating decision).

[10] R. at 1914-17.

[11] R. at 1599-1615.

[12] R. at 1589-91.

[13] R. at 1529-64.

[14] R. at 1521-27.

[15] R. at 1459-81.

[16] R. at 45-48.

[17] R. at 8.

## II. ANALYSIS

### A. Is a Referral Decision Under 38 C.F.R. § 4.16(b) a Factual Finding?

Typically, VA compensates veterans for their service-connected disabilities through its rating schedule, which is designed to reflect the average impairment in earning capacity that a veteran with a certain type of disability would experience.[18] But, in certain circumstances, VA can determine that a veteran is unemployable as a result of his or her service-connected disabilities even when he or she hasn't met the requirements for a 100% rating.[19] In those instances, 38 C.F.R. § 4.16(a) and (b) kick in. Section 4.16(a) addresses schedular TDIU, which applies where a veteran has a single disability rated at 60% or more, or two disabilities rated collectively at 70% or more where one of them is rated at least 40% or more.[20] The veteran doesn't argue he's entitled to TDIU under subsection (a). Instead, this appeal is about § 4.16(b).

That section reads, in full:

> It is the established policy of the Department of Veterans Affairs that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. Therefore, rating boards should submit to the Director, Compensation Service, for extra-schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities, but fail to meet the percentage standards set forth in paragraph (a) of this section. The rating board will include a full statement as to the veteran's service-connected disabilities, employment history, educational and vocational attainment and all other factors having a bearing on the issue.[21]

In *Wages v. McDonald*, this Court held that the Director's decision with respect to extraschedular consideration "is no different than an RO's decision in terms of its effect on the Board' statutory jurisdiction and the Board's standard of review."[22] Thus, under § 4.16(b), VA adjudicators, including the Board,[23] should refer claims to the Director for "all veterans who are unable to secure and follow a substantially gainful occupation" because of their service-connected disabilities.[24] Then, the Director can either award or deny an extraschedular rating. If the Director

---

[18] *See* 38 C.F.R. § 4.1 (2018).

[19] *See Withers v. Wilkie*, 30 Vet.App. 139, 144 (2018).

[20] 38 C.F.R. § 4.16(a) (2018).

[21] 38 C.F.R. § 4.16(b).

[22] 27 Vet.App. 233, 238 (2015).

[23] *See Bowling v. Principi*, 15 Vet.App. 1, 10 (2001) (holding that § 4.16(b) applies to the Board).

[24] 38 C.F.R. § 4.16(b). We note that neither the RO nor the Board is permitted to decide in the first instance whether

4

denies an extraschedular TDIU rating, the claim returns to the Board, which reviews the denial without deference to the Director just as the Board would review the RO's denial without deference to the RO.[25] The Board then decides whether to award or deny an extraschedular rating.[26] It's this three-step process that's at issue here.

In July 2014, the Board remanded the veteran's TDIU claim so an RO could refer it for extraschedular consideration, stating that

> additional development is required before the remaining issue [of TDIU] is decided. The Veteran does not current [sic] meet the schedular criteria for the assignment of TDIU. However, a review of the record shows that the Veteran *may* be prevented from physical labor by limitations resulting from his service-connected ventral hernia. While the [October 2011] VA examiner indicated the Veteran was able to perform sedentary employment, *the record suggests that the Veteran may not be able to obtain such employment as it is inconsistent with his education and occupational background*.[27]

The veteran argues the Board's 2014 referral decision was a binding factual finding that the Board impermissibly changed when it denied him an extraschedular rating in 2017.[28] The Secretary argues the Board's 2014 referral decision "does not equate to a factual finding, but instead indicates simply [] that evidence of record warrants referral to the Director[.]"[29] We don't entirely agree with either position as both the veteran's and the Secretary's arguments would lead to absurd results.

If the veteran is right that the decision to refer a claim for extraschedular consideration is a binding factual finding, then the Director would be little more than a rubberstamp. Put simply, it can't be the case that when the Board refers a claim to the Director for extraschedular consideration and the Director denies an extraschedular rating, the Board then must award an extraschedular rating anyway because of its initial referral decision. Such a reading of § 4.16(b) would make the Director superfluous as any claim that reached the Director from the Board would inevitably be granted by the Board when returned to it. We have an obligation to avoid such an absurd result[30]

---

an extraschedular rating is warranted, only whether the facts presented warrant referral to the Director. *See Floyd v. Brown*, 9 Vet.App. 88, 95 (1996).

[25] *Wages*, 27 Vet.App. at 238.

[26] *Id.*

[27] R. 1478 (emphasis added).

[28] *See* Appellant's Brief (Br.) at 10-12.

[29] Secretary's Br. at 8.

[30] *See Atencio v. O'Rourke*, 30 Vet.App. 74, 83 (2018) (noting that absurd results are "something courts should avoid

and to shy away from any interpretation that makes the additional language mere surplusage.[31] Nor is the veteran correct that 38 C.F.R. § 20.1303 applies here. That regulation states that a "previously issued Board decision will be considered binding . . . with regard to the specific case decided."[32] Here, the "previously issued Board decision" in 2014 was a *referral* decision. The Board's decision to *refer* the TDIU issue and its decision to *award a rating* are different and distinct decisions such that the Board isn't precluded from denying an extraschedular rating after referring a claim for extraschedular consideration. And, it's for those same reasons that the "law of the case" doctrine doesn't apply.[33]

But, on the other hand, the Secretary also can't be right that the referral decision isn't a factual finding as it clearly involves the application of a legal standard, § 4.16(b), to the facts of a given claim. Additionally, this Court, in an en banc opinion, *Pederson v. McDonald*, has held that the Board's referral denials are factual decisions to be upheld absent clear error.[34] We can think of no principled reason why the decision not to refer a claim for an extraschedular determination is a factual one but a decision to refer a claim is not. Thus, and given the en banc Court's determination in *Pederson*,[35] not only do we disagree with the Secretary's argument, but even if we wanted to we couldn't agree.

B. Does Referral Under 38 C.F.R. § 4.16(b) Require the Board to Award an Extraschedular Rating?

Having dispensed with the parties' arguments, we turn to the question of what effect, if any, does the Board's determination to refer a case for extraschedular consideration under 38 C.F.R. § 4.16(b) have when the Board later reviews the Director's decision not to award an extraschedular TDIU rating? We conclude that the decision to refer a claim for extraschedular consideration is a

---

[31] *See Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (noting that the canon against surplusage requires the Court to avoid an interpretation that results in portions of text being read as meaningless); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001).

in statutory and regulatory interpretation"); *see also, e.g.*, *United States v. Wilson*, 503 U.S. 329, 334 (1992) ("[A]bsurd results are to be avoided."); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) (applying "the canon that a statutory construction that causes absurd results is to be avoided if at all possible").

[31] *See Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (noting that the canon against surplusage requires the Court to avoid an interpretation that results in portions of text being read as meaningless); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001).

[32] 38 C.F.R. § 20.1303 (2018).

[33] *See Johnson v. Brown*, 7 Vet.App. 25, 26 (1994) (the law of the case doctrine "preclude[s] reconsideration of identical issues" when "a case is addressed by an appellate court, remanded, [and] returned to the appellate court").

[34] 27 Vet.App. 276, 286 (2015) (en banc).

[35] *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992) ("Only the en banc Court may overturn a panel decision.").

factual finding that doesn't bind the Board when it later decides whether to award an extraschedular rating. This is so because the decisions to refer and to award a rating are fundamentally different. As we explain, the referral decision could affect the later "award" decision in a case-specific way, but there's no categorical relationship between these two distinct determinations.

While the plain text of § 4.16(b) certainly doesn't explain how the referral and rating award decisions are different, "[w]hen assessing the meaning of a regulation, words should not be taken in isolation but rather read in the context of the regulatory structure and scheme."[36] We review the interpretation of regulations without deference to the Board.[37] Bearing in mind the regulatory structure and scheme VA has created to award extraschedular TDIU ratings, we hold that the initial extraschedular referral decision under § 4.16(b) addresses whether there's sufficient evidence to substantiate a reasonable possibility that a veteran is unemployable by reason of his or her service-connected disabilities.[38] The Director then performs his or her duties and, if the Director denies an extraschedular rating, the Board then, reviewing that decision without deference[39] and bearing in mind the benefit of the doubt standard,[40] decides whether the preponderance of the evidence nevertheless shows that a veteran is unemployable by reason of his or her service-connected disabilities.[41]

VA's own internal guidelines support such a reading of § 4.16(b). The M21-1 provides that referral is appropriate, in part, when "*there is evidence* that the Veteran *may* be unable to secure or follow a substantially gainful occupation because of a service-connected disability."[42] Of course, the M21-1 isn't binding on the Board[43] but an interpretation of § 4.16(b) that is in line with VA's

---

[36] *Atencio*, 30 Vet.App. at 82 (citing *King v. Shinseki*, 26 Vet.App. 484, 488 (2014)).

[37] *See id.*; *see also Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006).

[38] In *Stanton v. Brown*, 5 Vet.App. 563, 570 (1993), the Court seemed to implement a similar standard. There, the Court held that a veteran who had given lay testimony (but nothing more) regarding his inability to seek or maintain employment had "presented a well-grounded claim for a total disability rating under section 4.16(b)." Thus, our holding merely elaborates on the standard used in *Stanton*.

[39] *Wages*, 27 Vet.App. at 239 (the Director's decision to deny an extraschedular rating "is simply a decision that is adopted by the RO and reviewed de novo by the Board").

[40] *See* 38 U.S.C. § 5107(b); *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990).

[41] *See Ortiz v. Principi*, 274 F.3d 1361, 1365 (Fed. Cir. 2001).

[42] VA ADJUDICATIONS PROCEDURES MANUAL (M21-1), pt. III, subpt. iv, ch. 6, § B (emphasis added).

[43] *See, e.g., Gray v. Sec'y of Veterans Affairs*, 875 F.3d 1102, 1108 (Fed. Cir. 2017), *cert. granted*, 139 S. Ct. 451 (2018).

practice lends support to our analysis. An interpretation of § 4.16(b) requiring different evidentiary standards at different times in the extraschedular process finds support in other areas of the law. For example, in *McClendon v. Nicholson*, this Court held that a veteran need only show "some indication" of a disability to trigger VA's duty to obtain a medical examination.[44] But "some indication" is a standard far lower than that required for the ultimate determination whether a veteran's disability is related to his or her service. Similarly, in general civil litigation, a party seeking a preliminary injunction need only show he or she is "likely" to win on the merits.[45] Yet when that party seeks a permanent injunction, the evidentiary threshold changes and he or she must show ultimate success on the merits.[46]

One final point on this issue. The Board's obligation to provide an adequate statement of reasons or bases to support its decision[47] also applies when the Board reviews the Director's decision not to grant an extraschedular TDIU rating.[48] Thus, the Board must ensure that it adequately explains its reasoning when a factual finding made at the referral stage comes out differently at the review stage. Some factors that may affect the Board's ability to reach a different result or the adequacy of its discussion of reasons or bases include, but are not limited to, the certainty or complexity of factfinding in the initial referral decision and to the extent to which the record has changed since the referral decision. Thus, the referral decision can still be relevant at the award stage in certain circumstances. For example, where the Board finds referral appropriate because "it is beyond dispute" that a veteran was unemployable because of his service-connected disabilities, more explanation might be needed for a contrary finding than where the Board's referral finding is more equivocal. It's also possible that no amount of explanation may overcome the Board's initial finding.

Here, since the Board's decision didn't explain why the factual finding it made at the referral stage came out differently at the review stage, remand is warranted.[49] On remand, the Board must ensure that it explains its different factual determinations at the referral and review stages.

---

[44] 20 Vet.App. 79, 83 (2006).

[45] *See, e.g.*, *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).

[46] *See, e.g.*, *Apple Inc. v. Samsung Electrs. Co., Ltd.*, 809 F.3d 633, 639 (Fed. Cir. 2015).

[47] *Allday v. Brown*, 7 Vet.App. 517, 527 (1995).

[48] *See* 38 U.S.C. § 7104(d)(1); *see also Frost v. Shulkin*, 29 Vet.App. 131, 139 (2017); *Allday*, 7 Vet.App. at 527; *Gilbert*, 1 Vet.App. at 56-57.

[49] *See Tucker v. West*, 11 Vet.App. 369, 375 (1998).

Although we're remanding this matter to the Board because of its inadequate reasons or bases regarding its contradictory extraschedular determinations, we must also address the ambiguity of the phrase "unable to secure and follow substantially gainful employment." "Without a definition of the phrase or, at the very least, a list of factors that VA adjudicators should consider in making that determination, there is no standard against which VA adjudicators can assess the facts of a veteran's case,"[50] thus leading to insurmountable reasons or bases errors in Board decisions.

### C. Interpreting "Substantially Gainful Employment"

"Expert discretion is the lifeblood of the administrative process, but '[u]nless we make the requirement for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'"[51] Although "the law does not demand perfect consistency in administrative decision-making,"[52] "overly ambiguous standards almost inevitably lead to inconsistent application."[53]

In *Ferraro v. Derwinski*, a case almost as old as this Court, the Court noted that "'[s]ubstantially gainful employment' is a term of art which . . . has no concrete definition."[54] The Court left "the development of such a definition to the Secretary and urge[d] that he establish a clear definition for this term," explaining that "[t]his would be helpful, not only as an aid to veterans, but also as an aid to VA decision-makers and to this Court in future decisions."[55] The Court's encouragement has gone unheeded for 27 years.

The Court next addressed this issue in *Moore v. Derwinski*.[56] There, the Court stated that "there is a need for the Secretary to clarify the regulations concerning unemployability."[57] But the Court was "not yet prepared to impose a Court-created rule upon" the Board and "suggest[ed] to

---

[50] *Cantrell v. Shulkin*, 28 Vet. App. 382, 390–91 (2017).

[51] *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) (quoting *New York v. United States*, 342 U.S. 882, 884 (1951) (Black, J., dissenting)) (emphasis omitted).

[52] *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 103 (1st Cir. 2002).

[53] *King v. LaMarque*, 464 F.3d 963, 966 (9th Cir. 2006).

[54] 1 Vet.App. 326, 333 (1991).

[55] *Id.*

[56] 1 Vet.App. 356 (1991).

[57] *Id.* at 359.

the Secretary that there is much that could be borrowed from" federal appellate decisions interpreting a similar term, substantial gainful activity, found in Social Security regulations.[58] Then, in 2000, the Court, after looking to Social Security regulations for guidance, defined the term but limited its definition to the facts of the particular case.[59]

VA is aware of the problems created by the lack of defined terms in § 4.16(b). In September 1987, the U.S. General Accounting Office, now the Government Accountability Office (GAO), examined VA's TDIU rating process, concluding that the lack of defined terms in § 4.16 could lead to inconsistent outcomes and give "the appearance of arbitrary and inequitable decision[-]making."[60] Similarly, in June 2015, the GAO again investigated VA's TDIU analysis, concluding that "VA's procedures do not ensure that [TDIU] benefit decisions are well-supported."[61]

Despite this issue's appearance before the Court so often, the Court's repeated encouragement, and the GAO findings, the Court again recently declined to define "substantially gainful employment" "without first allowing VA to take a position on the matter,"[62] noting that "[i]t is VA's responsibility to define the terms contained within its regulations and the Court encourages it do so."[63] Yet, from *Ferraro* in 1991 to *Ortiz-Valles* in 2016 to the matter before us today, VA has refused to provide an adequate definition. The lack of any articulable standards by which veterans' extraschedular TDIU claims are judged renders the Board's reasons or bases here inadequate.[64] But this isn't the Board's fault. The regulation simply provides no guidance to either veterans or VA's own adjudicators, an inadequacy of VA's TDIU regulations that, as just discussed,

---

[58] *Id.*

[59] *See Faust v. West*, 13 Vet.App. 342, 355 (2000) ("In view of the fact that the Secretary has yet to issue a clear definition of substantially gainful employment, despite the Court's encouragement to that effect . . . , today we articulate such a definition for the purpose of dealing with the facts of this case.").

[60] U.S. GEN. ACCOUNTING OFFICE, IMPROVING THE INTEGRITY OF VA'S UNEMPLOYABILITY COMPENSATION PROGRAM at 18, 42 (Sept. 21, 1987).

[61] U.S. GEN. ACCOUNTABILITY OFFICE, VA CAN BETTER ENSURE UNEMPLOYABILITY DECISIONS ARE WELL SUPPORTED, GAO 15-464 (June 2015).

[62] *Ortiz-Valles*, 28 Vet.App. at 72.

[63] *Id.*

[64] *See King*, 464 F.3d at 966.

has been well identified.[65] Thus, today, we step in and interpret the meaning of being "unable to secure and follow substantially gainful employment."

This isn't a revolutionary exercise. Indeed, unless they must defer to the promulgating agency, courts regularly define regulatory terms when they're ambiguous.[66] Recently, this Court did just that when faced with an ambiguous term in Diagnostic Code 7522.[67]

We begin our analysis by looking to the language of the regulation.[68] If, from the language of the regulation, the plain meaning of the phrase "unable to secure and follow substantially gainful employment" is clear, then that meaning controls, and our inquiry is finished.[69] But, if the language is ambiguous, then we may define the phrase unless we "must defer to the agency's interpretation of its regulation unless that interpretation is inconsistent with the language of the regulation, is otherwise plainly erroneous, or does not represent the agency's considered view on the matter."[70]

The language of § 4.16(b) is ambiguous. The regulation instructs "that all veterans who are unable to secure and follow a substantially gainful occupation" because of their service-connected disabilities will "be rated totally disabled" without defining what either "a substantially gainful occupation" is or what it means to be "unable to secure and follow" such an occupation.[71] Section 4.16(a) provides that "substantially gainful employment" is employment that is not "marginal" with "marginal" defined as employment producing an annual income below the Federal poverty threshold for one person.[72] But this is, at best and as we discuss below, an incomplete definition.

---

[65] *See supra* note 61.

[66] *See, e.g.*, *Young v. United Parcel Serv.*, 135 S. Ct. 1338, 1353-54 (2015); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012); *see also Elgin Nursing v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013) ("Unfettered by DHHS's interpretation of the [regulation at issue], we apply the traditional tools of textual interpretation to determine its fair meaning[.]").

[67] *See Williams v. Wilkie*, 30 Vet.App. 134, 138 (2018) ("Although DC [Diagnostic Code] 7522 requires a 'deformity' for a compensable rating, VA has not expressly defined this term. The Court will therefore assign the ordinary meaning of this word.").

[68] *See Cantrell v. Shulkin*, 28 Vet.App. 382, 389 (2017) (citing *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993)).

[69] *See Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006).

[70] *Cantrell*, 28 Vet.App. at 390; *see also Auer v. Robbins*, 519 U.S. 452 (1997).

[71] 38 C.F.R. § 4.16(b).

[72] 38 C.F.R. § 4.16(a).

Thus, the plain language of the regulation insufficiently guides us as to the proper meaning of § 4.16(b)'s terms.

Having concluded that the phrase is ambiguous, we turn first to the Secretary's views. In his supplemental brief, he defined substantially gainful employment as "employment that produces income exceeding the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person."[73] This interpretation of § 4.16(b) merits no deference. First, the Secretary has not once, neither in his briefs nor at oral argument, asked for deference, a waivable argument.[74] Second, even if we construe the Secretary's oral argument as seeking deference, this Court will "generally not entertain arguments raised by counsel at oral argument for the first time."[75] Third, even if the issue of deference had been raised, we review the Board's decision, and there's no indication that the Board adopted or was even aware of any definition along the lines the Secretary presented to the Court. Fourth, it's unclear *what* we would defer *to*. At oral argument, the Secretary's counsel referenced the M21-1 as a possibly defining the terms in § 4.16(b).[76] But the Board didn't cite the M21-1, and even if it had, the M21-1 isn't binding on the Board.[77] If we decided to defer to the nonbinding M21-1, we would be undermining the Federal Circuit's holding in *Gray*, because the M21-1 would effectively bind the Board as we'd be required to defer to it and thus judge the Board against its provisions.[78] Fifth, VA may arguably be

---

[73] Secretary's Supplemental Br. at 10.

[74] *See Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1369 (Fed. Cir. 2015); *Norvell v. Peake*, 22 Vet.App. 194, 201 (2008).

[75] *Sellers v. Wilkie*, 30 Vet.App. 157, 166 (2018); *see also McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1263 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review."); *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1332-33 (Fed. Cir. 2001) ("It is well settled that an appellant is not permitted to make new arguments that it did not make in its opening brief."); *Norvell*, 22 Vet.App. at 201 ("This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly discouraged parties from raising arguments that were not presented in an initial brief to the Court.").

[76] Oral Argument at 42:39-43:09, *Ray v. Wilkie*, U.S. Vet. App. No. 17-0781 (oral argument held Sept. 5, 2018). VA's M21-1 part IV, subpart ii, chapter 2, section F.1.c defines substantially gainful employment as

> [e]mployment at which non-disabled individuals earn their livelihood with earning comparable to the particular occupation in the community where the veteran resides. It suggests a living wage. Substantially gainful employment is competition (not protected) employment and with earning exceeding the amount established by the U.S. Department of Commerce, U.S. Census Bureau, as the poverty threshold for one person.

[77] *See Gray*, 875 F.3d at 1108.

[78] *See Overton v. Wilkie*, 30 Vet.App. 257 (2018).

owed deference under *Skidmore v. Swift & Co.*,[79] but applying *Skidmore* here wouldn't change the outcome. Under *Skidmore*, we're required to consider VA's "body of experience and informed judgment"[80] by considering "the thoroughness evident in [the Agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[81] But *Skidmore* deference (to the degree it truly is "deference"), unlike *Auer* deference, isn't controlling.[82] And the Secretary's "interpretation" offered here—an interpretation our concurring colleague accepts at face value[83]—shares many of the same features as the one the Supreme Court recently rejected after conducting a *Skidmore* analysis. In *Young*, the Department of Labor promulgated guidance on the proper meaning of "other persons" as used in the Pregnancy Discrimination Act.[84] The Supreme Court analyzed the agency's proffered interpretation under the *Skidmore* framework, concluding that its interpretation didn't merit special consideration because it was "a position about which [its] previous guidelines were silent" and was "inconsistent with positions for which the Government has long advocated," and because the agency failed to "explain the basis of its guidance."[85] Here, similar inconsistencies and lack of rationale plague the Secretary's definition.

Elsewhere, VA has stated that TDIU adjudicators "must consider a number of factors, including the frequency and duration of periods of incapacity or time lost from work due to disability, the veteran's employment history and current employment status, and the veteran's annual income from employment, if any."[86] Thus, VA's own interpretation is inconsistent, and neither the M21-1 nor the Secretary's proffered definition fully encapsulates the entire TDIU analysis—that is, whether a veteran is "unable to secure and follow substantially gainful employment" because of his or her service-connected disabilities.[87] Instead, they merely address

---

[79] 323 U.S. 134 (1944).

[80] *Id.* at 140.

[81] *Id.*

[82] *Id.* ("[T]he rulings, interpretations, and opinions of [the Agency] . . . [are] not controlling upon the courts.").

[83] *See post* at 23.

[84] 135 S. Ct. at 1351.

[85] *Id.* at 1352.

[86] VA Gen. Coun. Prec. 5-2005, at ¶5 (Nov. 25, 2005).

[87] This inconsistency, overlooked by our concurring colleague, matters because "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference'

13

one component of that analysis: the economic requirement. That requirement is straightforward: To receive an extraschedular TDIU rating, a veteran must have an earned annual income that doesn't exceed the Federal poverty threshold for one person.[88] But the economic requirement, standing alone, isn't enough. Were this the only requirement, the regulation's command that adjudicators "include a full statement as to the veteran's service-connected disabilities, employment history, educational and vocational attainment and all other factors having a bearing on the issue"[89] would make no sense because none of that information would be needed to determine whether a veteran's earned annual income exceeds the federal poverty threshold. Thus, the M21-1 and Secretary have offered, at best, incomplete interpretations of § 4.16(b).

The Secretary argues this incompleteness is an intentional and beneficial feature of the regulation. In his view, § 4.16(b) is designed to be "flexible" and "intentionally broad."[90] But that "flexibility" means that neither veterans nor this Court understand what the regulation means. Thus, the Secretary's position is untenable and wouldn't be entitled to deference because, as we've said, it's "the equivalent of 'because I say so'"[91] or "we know it when we see it."[92] Further, "vagueness is especially unhelpful when it comes to TDIU, where individual assessment is crucial."[93] The GAO aptly illustrated the effect of this vagueness:

> VA procedures do not ensure that Individual Unemployability benefit decisions are well-supported. For example, contrary to federal internal control standards, the guidance on determining unemployability is incomplete for ensuring consistency. In discussion groups with GAO, VA's rating specialists said they disagreed on the factors they need to consider when determining unemployability, and had difficulty separating allowable from non-allowable factors. Some specialists said these challenges create the risk that two raters could examine the same evidence and reach an opposite decision to approve or deny a claim.[94]

---

than a consistently held agency view." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

[88] 38 C.F.R. § 4.16(a).

[89] 38 C.F.R. § 4.16(b).

[90] Secretary's Supplemental (Supp.) Br. at 14-15.

[91] *Hood v. Brown*, 4 Vet.App. 301, 303 (1993).

[92] *Cantrell*, 28 Vet.App. at 390 ("Essentially the Secretary is asking the Court to defer to a 'we know it when we see it' definition of employment in a protected environment and to trust that the hundreds of VA adjudicators across the country will uniformly and consistently apply that undefined term without guidance from the Secretary.").

[93] *Withers*, 30 Vet.App. at 148.

[94] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO 15-464, VA CAN BETTER ENSURE UNEMPLOYABILITY DECISIONS ARE

Thus, we are left with an undefined and ambiguous regulatory phrase that we interpret as we would any other statute or regulatory phrase.

Ideally, VA, with its expertise, would have interpreted the phrase at some point after this Court first encouraged it to do so in 1991, but it hasn't. So, we provide guiding principles to frame the proper inquiry for extraschedular TDIU. [95] As we noted above, the Court has defined "substantially gainful employment" before.[96] Thus, we look to what the Court did there and draw upon existing TDIU caselaw and the litany of cases in which the Court has encouraged VA to adopt a complete definition.

"[E]ntitlement to TDIU is based on an individual's particular circumstances." [97] We recognize, as both the Secretary and veteran agree,[98] that with respect to "substantially gainful employment" § 4.16(b) includes an economic component: a veteran's income must be lower than the Federal poverty threshold.[99] But there's also no question that being "unable to secure and follow a substantially gainful employment" includes a non-economic component. "When the Board conducts a TDIU analysis, it must take into account the individual veteran's education, training, and work history."[100] "The question is whether the veteran is *capable* of performing the physical and mental acts required by employment, not whether the veteran can find employment."[101] As to mental abilities in particular, the Court has cited specific examples, such as a lack of social skills[102] and workplace stress.[103] "[W]e note that a determination whether a person is capable of engaging

---

WELL SUPPORTED, (2015).

[95] We note that both VA and veterans have means with which to change any definition or guidelines we provide today. VA can engage in notice-and-comment rulemaking under 38 U.S.C. § 501(a) and veterans may petition for rulemaking under 5 U.S.C. § 553(e) and appeal any denial to the Federal Circuit. *See Gray*, 875 F.3d at 1109.

[96] *See Faust*, 13 Vet.App. at 355.

[97] *Rice v. Shinseki*, 22 Vet.App. 447, 452 (2009); *see also* 38 C.F.R. § 4.15 (2018).

[98] *See* Appellant's Supp. Br. at 7; Secretary's Supp. Br. at 10.

[99] *See Ortiz-Valles*, 28 Vet.App. at 71 (noting that "substantially gainful employment" is employment "capable of producing income that is more than marginal—*i.e.*, with income that exceeds the amount published by the U.S. Department of Commerce for the poverty threshold for one person").

[100] *Pederson*, 27 Vet.App. at 286.

[101] *Van Hoose v. Brown*, 4 Vet.App. 361, 363 (1993) (emphasis in original).

[102] *Gleicher v. Derwinski*, 2 Vet.App. 26, 28 (1991).

[103] *Washington v. Derwinski*, 1 Vet.App. 459, 465 (1991).

in a substantially gainful occupation must consider both that person's abilities and his employment history."[104]

To apply meaning to § 4.16(b), we, just as the Court did in *Faust*,[105] choose to look to comparable Social Security regulations, specifically 20 C.F.R. §§ 404.1510 and 404.1572. Social Security regulations define "substantially gainful activity" as "work that—(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit."[106] These regulatory provisions clarify elsewhere that work can be substantial "even if it is done on a part-time basis or if [claimants] do less, get paid less, or have less responsibility than when [they] worked before," and that work is gainful "if it is the kind of work usually done for pay or profit, whether or not a profit is realized."[107] These regulations serve as useful guides for us in crafting our own principles for the unique nature of the veterans benefits system. To be sure, the Court has previously declined to order VA to adopt Social Security definitions.[108] And, to be clear, we *don't* adopt Social Security's regulations as VA regulations. To the extent we discuss them, we look to them only for "appropriate guidance," as the Court has done before.[109]

Thus, after canvassing this Court's TDIU caselaw, relevant Social Security regulations, and the parties' arguments, we interpret the phrase "unable to secure and follow a substantially gainful occupation" in § 4.16(b) to have two components: one economic and one noneconomic. The economic component simply means an occupation earning more than marginal income (outside of a protected environment) as determined by the U.S. Department of Commerce as the poverty threshold for one person. As for the noneconomic component, the Secretary himself states that "determining eligibility for TDIU requires more than determining the presence or absence of employment producing income exceeding any particular threshold," and "the ultimate inquiry is instead on the individual claimant's *ability* to secure or follow that type of employment."[110] Thus, in order to fully clarify our interpretation that the regulation has both an economic and

---

[104] *Faust*, 13 Vet.App. at 355.

[105] *Id.*; *see also Moore*, 1 Vet.App. at 359.

[106] 20 C.F.R. § 404.1510 (2018).

[107] 20 C.F.R. § 404.1572(a), (b) (2018).

[108] *See, e.g.*, *Withers*, 30 Vet.App. at 148-49; *Beaty v. Brown*, 6 Vet.App. 532, 538 (1994); *Moore*, 1 Vet.App. at 359.

[109] *Faust*, 13 Vet.App. at 355.

[110] Secretary's Supp. Br. at 11.

16

noneconomic component, we also provide guidance as to the meaning of a veteran's ability to "secure and follow" such employment.

In determining whether a veteran can secure and follow a substantially gainful occupation, attention must be given to

- the veteran's history, education, skill, and training;[111]

- whether the veteran has the physical ability (both exertional and nonexertional) to perform the type of activities (e.g., sedentary, light, medium, heavy, or very heavy)[112] required by the occupation at issue. Factors that may be relevant include, but are not limited to, the veteran's limitations, if any, concerning lifting, bending, sitting, standing, walking, climbing, grasping, typing, and reaching, as well as auditory and visual limitations;[113] and

- whether the veteran has the mental ability to perform the activities required by the occupation at issue. Factors that may be relevant include, but are not limited to, the veteran's limitations, if any, concerning memory, concentration, ability to adapt to change, handle work place stress, get along with coworkers, and demonstrate reliability and productivity.[114]

By discussing these potentially relevant factors, we don't create a checklist that must be run completely through in every case. Instead, discussion of any factor is only necessary if the evidence raises it.[115]

We recognize that this is the first occasion in which the Court has interpreted "unable to secure and follow a substantially gainful occupation" under § 4.16 and provided guidance on what it means to "secure and follow" said employment. But a "central tenet of administrative law [is] that a reviewing court may not affirm an administrative agency's actions on a reasoned basis different from the rationale actually put forth by the agency."[116] This rule is absolute. Courts are

---

[111] *Pederson*, 27 Vet.App. at 286; VA Gen. Coun. Prec. 5-2005, at ¶5.

[112] *See* 20 C.F.R. § 404.1567 (2018).

[113] *See, e.g.*, *Van Hoose*, 4 Vet.App. at 363.

[114] *Gleicher*, 2 Vet.App. at 28; *Washington*, 1 Vet.App. at 465.

[115] *See Dela Cruz v. Principi*, 15 Vet.App. 143, 149 (2001); *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991).

[116] *Pub. Media Ctr. v. F.C.C.*, 587 F.3d 1322 (D.C. Circuit 1978); *see Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 764 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*); *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (*Chenery I*).

"powerless to affirm [an] administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency."[117] Thus, we set aside the decision on appeal and remand this matter to the Board to provide reasons or bases that comport with this opinion and to develop any further evidence required.[118]

In pursuing his case on remand, the veteran is free to submit additional evidence and argument, including the arguments raised in his briefs to this Court.[119] The Board must consider any such evidence or argument.[120] The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for the decision." [121] The Board must proceed expeditiously.[122]

### D. Our Concurring Colleague's Concerns

Our concurring colleague takes issue with our decision to interpret "substantially gainful employment." He argues that, by providing an interpretation about an ambiguous regulation that the Court has pleaded with VA to define for 25 years, our decision "sweeps beyond the Court's limited, but essential, role of interpreting laws written by other branches of Government and instead directs the substantive content of the regulation itself."[123]

First, as our colleague himself notes, "this Court retains the authority to provide the final interpretation of [VA] regulations" and has "the obligation to do so in certain circumstances."[124] Section 7261, title 38, U.S. Code, lays out our scope of review. It commands us to "interpret constitutional, statutory, and regulatory provisions" "to the extent necessary to [our] decision[.]"[125] Our congressional mandate is clear. It's our duty to review the Board's decisions and "determine

---

[117] *Chenery II*, 332 U.S. at 198.

[118] *See Turner v. Shulkin*, 29 Vet.App. 207, 220 (2018).

[119] *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order); *see also Clark v. O'Rourke*, 30 Vet.App. 92, 97 (2018).

[120] *Kay v. Principi*, 16 Vet.App. 529, 534 (2002).

[121] *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991).

[122] 38 U.S.C. §§ 5109B, 7112.

[123] *Post* at 24 (emphasis in original).

[124] *Post* at 23.

[125] 38 U.S.C. § 7261(a)(1).

the meaning or applicability of the terms of an action of the Secretary[.]"[126] Indeed, judicial interpretation has been a cornerstone of the American legal system since the foundation of the Republic.[127] "The Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"[128]

Our colleague fails to address the inconsistencies in VA's proffered interpretation. He would have us adopt, without deferring to, the Secretary's interpretation because "it represents the most natural reading" of the regulation.[129] He claims, without support, that such a definition has "distinct benefits" because it "complements" the definition of "marginal employment" the Court articulated in *Ortiz-Valles* and "is consistent with VA's historical practice of adjudicating TDIU."[130] But, as we noted above, the Secretary's proffered interpretation in this appeal—which, it begs repeating, only came about after more than 25 years of judicial prodding and VA inaction— is actually inconsistent with previous VA guidance.

The Secretary has interpreted being "unable to secure and follow substantially gainful employment" in this appeal as "employment that produces income exceeding the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person."[131] Yet, he's previously interpreted § 4.16(b) to require adjudicators to "consider a number of factors, including the frequency and duration of periods of incapacity or time lost from work due to disability, the veteran's employment history and current employment status, and the veteran's annual income from employment, if any."[132] This is an inconsistency in VA's "historical practice of adjudicating TDIU" that neither our colleague nor the Secretary can explain because, as we explained above, the Secretary's interpretation is absurd.[133] It reads out the regulation's

---

[126] *Id.*; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 221 (1995) ("The power of '[t]he interpretation of the laws' [is] 'the proper and peculiar province of the courts.'" (citations omitted)).

[127] *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").

[128] *Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).

[129] *Post* at 23.

[130] *Id.*

[131] Secretary's Supp. Br. at 10.

[132] VA Gen. Coun. Prec. 5-2005, at ¶5 (Nov. 25, 2005).

[133] Our colleague notes that the Secretary's proffered interpretation is consistent with the M21-1. *See post* at 23. But, as we stated above, the Board didn't cite the M21-1, and even if it had, the M21-1 isn't binding on the Board. *See Gray*, 875 F.3d at 1108. The fact that line adjudicators are bound by the M21-1 is irrelevant to us here as we review

command that adjudicators "include a full statement as to the veteran's service-connected disabilities, employment history, educational and vocational attainment and all other factors having a bearing on the issue"[134] as none of that information is needed to determine whether a veteran's earned annual income exceeds the Federal poverty threshold. Our colleague fails to explain how the Secretary's interpretation is viable in the context of the entire regulation, instead focusing only on its economic means testing component.[135] Were he and the Secretary correct, all veterans across the Nation earning less than the Federal poverty line would be entitled to extraschedular TDIU benefits without any analysis of whether they can "secure and follow a substantially gainful occupation" despite their service-connected disabilities. The only test would be an income-based one. That simply makes no sense. We reject entirely such a limited interpretation.[136]

Notably, our colleague's views are inconsistent. On the one hand, he warns that our decision is a "restructure[ing] of [the way] VA adjudicates TDIU to bring it into alignment with the framework used by the Social Security Administration."[137] On the other, he writes that "many of" the factors we elucidate today "are already presumably captured by the open-ended inquiry that VA regulations and our caselaw already impose on the Board[.]"[138] Both can't be true. Either our decision is a restructuring of the TDIU framework or it merely identifies relevant factors that Board members already implicitly consider. If the former, it's the result of 25 years of VA inaction. If the latter, then our decision is sound as adjudicators, claimants, and this Court can only benefit from further clarity.[139]

---

the decisions of the Board, not line VA adjudicators. *See* 38 U.S.C. § 7252(a).

[134] 38 C.F.R. § 4.16(b).

[135] *See McCuin v. Sec'y of Health and Human Servs.*, 817 F.2d 161, 169 (1st Cir. 1987) ("In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions.").

[136] *See, e.g., Atencio*, 30 Vet.App. at 83 (courts should avoid interpreting regulations to lead to an absurd result).

[137] *Post* at 21.

[138] *Post* at 25.

[139] *See Allday*, 7 Vet.App. at 527; *Gilbert*, 1 Vet.App. at 56-57; *see also Chenery II*, 332 U.S. at 196-97 ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable."); *Int'l Longshoremen's Assoc. v. Nat'l Mediation Bd.*, 870 F.2d 733, 735 (D.C. Cir. 1989) ("The basis for an administrative decision, of course, must be clear enough to permit effective judicial review.").

Our colleague also oversimplifies and recasts our holding regarding what are, in his terms, "a set of mandatory factors" the Board must consider in making TDIU determinations.[140] As we explained above, "[b]y discussing these potentially relevant factors, we don't create a checklist that must be run completely through in every case. Instead, discussion of any factor is only necessary if the evidence raises it."[141] Finally, our colleague overlooks one crucial fact: VA is free to revise its regulations as it sees fit if it disagrees with our interpretations. Indeed, recently VA has done just that.[142]

Our decision here is simple: VA refused to define key regulatory terms for over 25 years, this frustrates judicial review of this appeal, and we have, therefore, interpreted § 4.16(b) after conducting all required deference analyses. We break no new ground. We simply engage in a routine act of regulatory interpretation.

### III. CONCLUSION

The Court SETS ASIDE the Board's February 15, 2017, decision and REMANDS the matter to the Board for further adjudication.

TOTH, *Judge, concurring in part and in the judgment*: I join the Court's decision on the effect of the Board's referral for extraschedular consideration. The treatment of the issue is cogent, faithful to the substance of applicable regulations, and provides a useful development of the framework that should allow for more consistent adjudication of TDIU. I respectfully decline, however, to join the Court in its definition of "substantially gainful employment."[143] Instead of merely defining an ambiguous term, the Court restructures how VA adjudicates TDIU to bring it into alignment with the framework used by the Social Security Administration. The approach taken

---

[140] *Post* at 23 (emphasis in original).

[141] *Supra* at 17.

[142] *See, e.g.*, Department of Veterans Affairs, Extra-Schedular Evaluations for Individual Disabilities, 82 Fed. Reg. 57,830 (Dec. 8, 2017) (abrogating *Johnson v. McDonald*, 28 Vet.App. 136 (2016)).

[143] 38 C.F.R. § 4.16 mentions both "substantially gainful employment" and "substantially gainful occupation." In *Ortiz-Valles v. McDonald*, we held these terms to be interchangeable in substance as regards their use in § 4.16. I therefore discuss only "substantially gainful employment" with the understanding that it covers both discrete terms. 28 Vet.App. 65, 70 (2016).

by the Social Security Administration might be more sensible, or just, but it is not one that we can impose on VA absent a clear indication that Congress intended this approach.

All administrative law involves the separation of powers, and few cases demonstrate this fact more plainly than this one. Indeed, this case may serve as a cautionary tale for why administrative agencies should at least attempt to define their own ambiguous terms rather than leaving a blank slate for a court to supply its own meaning. As the majority notes, we first asked VA for a definition of "substantially gainful employment" in *Ferraro v. Derwinski*, 1 Vet.App. 326, 333 (1991), and repeated this request over the years in a series of cases. *See Moore v. Derwinski*, 1 Vet.App. 326 (1991); *Faust v. West*, 13 Vet.App. 342, 355 (2000); *Ortiz-Valles v. McDonald*, 28 Vet.App. at 70.

Unmoved by our repeated requests, VA doubled down in its initial briefing, contending that it need not provide a definition for "substantially gainful employment," as the criteria established in § 4.16 are "intentionally broad and intended to allow VA adjudicators 'in the judgment of the rating agency' the ability to determine whether the facts of any case establish individual unemployability due to service connected disabilities." Sec's Br. at 15. Indeed, this was largely the same position that VA forwarded a year ago in a different TDIU case, *Cantrell v. Shulkin*, 28 Vet.App. 382, 393 (2017). In *Cantrell*, the Agency contended that it need not provide a definition for what it meant to work "in a protected environment" to allow "the factfinder to make a determination on a case-by-case basis." *Id*. at 390. In response, we took VA to task for asking the Court to defer to a standard-less, "we know it when we see it" definition. *Id*.

One cannot help notice a recurring theme: VA promulgates broad, open-ended regulations containing undefined terms and then ignores this Court's entreaties to develop working definitions for such terms. As justification, VA points to the fact-specific nature of the overall adjudication itself, as though this somehow prevents the Agency from formulating interpretations of specific terms within the regulation. But although the factors that render someone unable to work may be manifold and open-ended, that doesn't mean that specific terms such as "substantially gainful employment," "marginal employment," or "protected environment" must remain as moving targets, bending to the discretion of factfinders. These terms are readily capable of definition, regardless of how open-ended the overall adjudication may be.

As a matter of comity, courts grant executive agencies the opportunity to first explain how they interpret their own regulations and generally defer to such interpretations when they represent

22

agency expertise, have a working history within the agency, and are consistent with the regulation's language. *See Auer v. Robbins*, 519 U.S. 452 (1997). For a fuller explanation, *see* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L. J. 908 (2018). To be sure, there are many complex issues related to agency deference that remain unsettled, as evidenced by the fact that the Supreme Court recently took a case to address some of these questions, *Kisor v. Wilkie*, 869 F.3d 1360 (Fed. Cir. 2017), *cert. granted*, No. 18-15, 2018 U.S. LEXIS 7219 (Dec. 10, 2018). But this much is certain: when an agency makes no attempt over the course of decades to define specific terms, the usual interplay between court and agency breaks down. Rather than treating its regulations as closely held property, VA would do well to recognize that this Court retains not only the authority to provide the final interpretation of its regulations, but the obligation to do so. *See* 38 U.S.C. § 7261(a)(1); *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1222-23 (2015) (Thomas, J., concurring). VA can either participate in this process or not, but it cannot wish it away.

I agree, then, with my colleagues that *Auer* deference is not warranted here because at no point did the Agency present an actual interpretation of "substantially gainful employment" that had any bearing on its adjudication of Mr. Ray's case. When pressed by this Court to provide a definition, VA eventually did so; specifically, the Secretary proposed the phrase to mean "employment that produces income exceeding the amount established by the United States Department of Commerce, Bureau of the Census, as the poverty threshold for one person." Sec's Supp. Br. at 10. Notably, this definition is consistent with the standard set out in the M21-1, which binds line adjudicators and which the Secretary cited in his supplemental brief. *Id.* at 11 n.3; *see* M21-1, pt. IV, sbpt. ii, ch. 2, sec. F.1.c.

The majority rightfully explains why we cannot confer *Auer* deference to this proposed definition, but it never explains why the definition is unpersuasive even under the more demanding (to an agency) persuasiveness standard spelled out in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). For my part, I find this definition persuasive as it represents a natural reading of "substantially gainful employment" and coheres with the overall structure and context of § 4.16. This definition, furthermore, has distinct benefits: it is clear, it complements the definition of "marginal employment" set out in § 4.16(a), and it is consistent with VA's historical practice of adjudicating TDIU. As a clearly identifiable marker, it puts to rest any confusion about what "substantially gainful employment" might mean for an individual factfinder.

Rejecting VA's narrow definition, the Court takes a broader approach and attempts to reduce to a single definition what it means to be "unable to secure or follow a substantially gainful occupation." In so doing, it looks "to comparable Social Security regulations" for "appropriate guidance," *ante* at 16, and then proceeds to list a set of *mandatory* factors that "attention must be given to." *Id*. These factors are taken directly from Social Security regulations, particularly from 20 C.F.R. §§ 404.1510, 404.1560-404.1569a, and 404.1572.

But there are a few problems with this approach. Outside of the term "substantially gainful," nothing in that phrase is actually ambiguous—it's merely open-ended. As a matter of plain language, to be "unable to secure or follow" an "occupation" or "employment" means only that a veteran is not able to work—a wholly straightforward matter for a factfinder, who need merely find evidence that the veteran is not working. Rather than resolving a textual ambiguity, the Court proposes a definition designed to account for all the possible reasons *why* a veteran might not be able to work. This approach might fit better if we focused on the phrase "as a result of" in 4.16(a) or "by reason of" in 4.16(b), which is the proximate cause language linking the veteran's disability to the inability to work. But even focusing on the proximate cause language is problematic because that language does not present an interpretive ambiguity; it merely states a required showing that the disability—and not other factors—be the discrete cause of the veteran's inability to get or keep a job. The proximate cause requirement may be open-ended in that it accounts for any number of factors, but it does not comprise a textual ambiguity.

Which gets to the deeper concern I have about our proposed definition: it seems out of proportion to any interpretive problem presented by the text of the regulation. In its scope, it rings more *legislative* than judicial in nature as it sweeps beyond the Court's limited, but essential, role of interpreting laws written by other branches of government and instead directs the substantive content of the regulation itself. Before our ruling, the Board faced an open-ended regulation adjudicating TDIU; now it must consider the same regulation in light of veteran's ability to do "heavy" or "very heavy" work, "get along with coworkers," "adapt to change," and so forth. *Ante* at 17.

The sweeping nature of our definition might fit better if we held the current regime of TDIU adjudication to be arbitrary as a result of a lack of meaningful standards, but that isn't the case. Broad statutes or regulations sometimes require a court to interpret and reduce an open-ended provision into a framework that allows for consistent adjudication. But as far as I can tell, while

24

the Court has repeatedly chided VA for leaving material terms undefined, it has never claimed that TDIU adjudications under § 4.16 are standard-less or arbitrary. While open-ended, the framework contains a set of straightforward elements: TDIU is warranted when a veteran is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). Thus, a TDIU claimant must show that he or she is (1) unable to secure or follow, (2) a substantially gainful occupation or employment, (3) as a result of, (4) service-connected disabilities (or disability). *Pederson v. McDonald*, 27 Vet.App. 276, 286 (2015) (en banc). Basically, TDIU amounts to a showing of whether a veteran's service-connected disabilities, and not other factors, render the veteran unable to work. *Id.*

Notably, many of the factors mandated by the Court are already presumably captured by the open-ended inquiry that VA regulations and our caselaw already impose on the Board—namely to address all relevant matters raised in a veteran's case. The difference, I believe, is that under the plain language of § 4.16, adjudicators must account for how a disability affects a veteran's ability to work based on the evidence of record rather than a court-imposed set of factors. To reduce all conceivably relevant factors into a comprehensive, catch-all, definition effectively recasts the substance of the regulation into a creation of this Court; it converts an otherwise open-ended but straightforward inquiry of whether a veteran's disability is the proximate cause of his or her inability to work into something akin to a multi-point inspection evaluating a variety of factors whose relevance to any case is uncertain.

I respectfully decline to join the section of Court's opinion defining "substantially gainful employment" as I believe that it goes beyond interpreting the text of a regulation drafted by a separate branch of government and instead grafts on substantive factors that do not derive from the regulation itself. To me, this falls closer to an exercise of legislative than judicial authority. Because courts possess no such legislative authority, we cannot impose on agencies our own notions of what laws and procedures we deem best. *See Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 549 (1978).